**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Roy F. MUNOZ, Defendant-Appellant.**

**No. 81–1747.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 1982.

Decided March 22, 1983.

Stephen R. Sady, Portland, Or., for defendant-appellant.

Ellen F. Rosenblum, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before CHOY, TANG and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge.

Munoz appeals from his conviction for possessing and transporting a golden eagle in violation of 16 U.S.C. § 668(a) (1976).[1]

1. 16 U.S.C. § 668(a) (1976) provides in part: Bald and golden eagles—Prohibited acts; criminal penalties

(a) Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in

He argues that the evidence should have been suppressed because it was found during a roving vehicle stop that was not supported by a founded suspicion. At issue is whether the practice of stopping all vehicles in National Parks during a roving patrol to check wood permits and ask about park use and game violations is permissible under the Fourth Amendment. We conclude that the stop violated Fourth Amendment rights and reverse.

## FACTS

On December 31, 1980, Munoz invited a friend to go with him to Mount Hood National Forest to pick up a dead golden eagle that Munoz told his friend he found in a trap. Munoz drove his pickup truck to the White River Management Area located within the National Forest, where Munoz had left the bird hidden in a tree.

Munoz placed the eagle in the back of the truck along with a dead doe and the head of a buck deer.[2] He covered the deer and the eagle with cut timber gathered from a cutting site and some logs picked up from the side of the road.

On that same day, Oregon State Police game trooper Patton and Oregon Department of Fish and Wildlife biologist Beck were patrolling the National Forest near the Wildlife Management Area. They were conducting a roving patrol in a Dodge pickup truck with the Oregon State Police insignia on the doors.[3] Patton was in uniform. They were stopping all vehicles in that area to check for wood-cutting permits,[4] to conduct a brief interview asking what park visitors had seen or done, and to check for possible game violations in the heavy game wintering area.[5]

Patton and Beck saw Munoz's truck heading out of the park about one mile away from the forest boundary. From his truck, Patton waved for Munoz to stop when Munoz was about 50 to 75 yards away. At the same time he flagged Munoz, Patton saw the cut wood in the back of Munoz's truck, but the decision to stop the vehicle was made independently of that fact.

When Munoz stopped his truck next to Patton's, Patton saw deer hair on the front of Munoz's truck. Patton noticed Munoz's hands were covered with blood and saw more deer hair inside the cab of Munoz's truck. He told Munoz to get the deer out from under the wood in the back of the truck. After Munoz unloaded the wood and pulled out the doe, Patton saw bird tail feathers in the truck. Patton recognized the bird as a golden eagle when Munoz removed it from the back of the truck.

Munoz was charged with a misdemeanor violation of the Eagle Protection Act, 16 U.S.C. § 668(a) (1976). The court denied Munoz's motion to suppress the physical evidence. Munoz pleaded not guilty and

[sections 668 to 668d of this title], shall knowingly, or with wanton disregard for the consequences of this act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner any bald eagle commonly known as the American eagle or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to [sections 668 to 668d of this title], shall be fined not more than $5,000 or imprisoned not more than one year or both.

2. Possession of the deer was a violation of state law; it was not deer season at the time of the incident. Munoz was not charged with state violations relating to the deer.

3. The United States Forest Service and the Oregon Fish and Wildlife Department have a cooperative agreement providing for mutual exchange of information obtained by state or federal game officers and employees.

4. Persons are permitted to cut and remove firewood from certain designated areas in Mt. Hood National Forest if they obtain a park-issued "Free Use Firewood Permit".

5. Each party argues that the other mischaracterizes the purpose of the stop. Munoz argues the check for wood permits was a pretext to look for game violations because Patton never checked Munoz's permit. The Government asserts that Patton stopped visitors to ask if they observed any suspicious activities or game violations, and stopped Munoz in particular to check his firewood permit. Testimony by Patton and Beck indicates they intended to stop everyone they saw and that their reasons for doing so included all three reasons listed above.

waived jury trial. He was tried on stipulated facts and found guilty.

## I.

### Applicability of Fourth Amendment

■ The Fourth Amendment is "implicated" in this case because stopping a truck and detaining its occupants "constitute a 'seizure' within the meaning of [that amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).[6]

■ Officer Patton had neither probable cause to believe nor a reasonable suspicion that Munoz was engaged in criminal activity.[7] No exception to the probable cause requirement or the reasonable suspicion requirement governed that stop. *See, e.g., United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

## II.

### Standard of Review

■ Regardless of whether we apply a clearly erroneous standard, *United States v. Post,* 607 F.2d 847, 849 (9th Cir.1979), or conduct an independent review, *United States v. One Twin Engine Beech Airplane,* 533 F.2d 1106, 1108 (9th Cir.1976), we hold that the district court erred in denying the motion to suppress the physical evidence. Because the seizure violated Fourth Amendment rights, the resulting search of the vehicle was tainted, requiring suppression of the evidence. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## III.

### Application of State or Federal Law

Before analyzing the legality of the stop, we must address a preliminary issue. It was once the rule in this Circuit that the admissibility of evidence obtained by state law enforcement officials depended on the legality of their actions when measured under both state and federal standards. *See, e.g., United States v. Lovenguth,* 514 F.2d 96, 98 (9th Cir.1975) (per curiam). That rule was temporarily abandoned in *United States v. Grajeda,* 570 F.2d 872 (9th Cir. 1978), which was later withdrawn and replaced by *United States v. Grajeda,* 587 F.2d 1017 (9th Cir.1978) (per curiam) (*Grajeda II*). Since *Grajeda II,* we have avoided the question of whether the traditional rule is still valid. *See, e.g., United States v. Wheeler,* 641 F.2d 1321, 1322 n. 1 (9th Cir.1981); *United States v. Collom,* 614 F.2d 624, 627–28 (9th Cir.1979). Because we find the stop in this case illegal under both Oregon and federal law, it is unnecessary to resolve this issue.

## IV.

### Oregon Law

■ The district court ruled that the stop by the Oregon game officials did not violate Oregon law, and cited *State v. Tourtillott,* 289 Or. 835, 618 P.2d 423, 425–27 (1980), *cert. denied,* 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 352 (1981). We must defer to a district judge's assessment and application of the state law of his district unless clearly wrong. *See, e.g., Clark v. Musick,* 623 F.2d 89, 91 (9th Cir.1980).

■ The district court apparently overlooked *State v. Odam,* 40 Or.App. 551, 595 P.2d 1277 (1979), *aff'd by equally divided court,* 290 Or. 160, 619 P.2d 647 (1980). In *Odam,* an Oregon game officer stopped the defendant pursuant to the officer's inten-

---

**6.** The trial court held that "in a wildlife protected area and firewood permit area, an individual has no reasonable basis for believing that his or her vehicle will not be stopped."

**7.** Patton saw Munoz's load of wood at about the same time, not before, he waved Munoz to stop. Carrying wood was not illegal in the park, and Patton stated he would have stopped Munoz even if he had not seen wood in his truck.

tion to stop all vehicles he saw in a certain area. The stop was not based on any individualized suspicion of criminal activity. Upon approaching the stopped vehicle, the officer observed criminal evidence in "plain view." The Oregon court of appeals ruled the stop illegal, and affirmed the trial court's suppression order. In doing so, the court rejected the dissent's argument that the stop was lawful because the officer applied a neutral, nondiscretionary criterion to determine which vehicles to stop, *i.e.*, he intended to stop every vehicle he encountered. 595 P.2d at 1278–79.

In contrast, *Tourtillott* involved a checkpoint stop designed to check hunters' compliance with the game laws and to gather statistics regarding the hunters' success. That case is readily distinguishable from *Odam*, however, because the subjective intrusion caused by a roving stop, as occurred in *Odam* and this case, is significantly greater than that involved in a checkpoint stop. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 558–59, 96 S.Ct. 3074, 3083–3084, 49 L.Ed.2d 1116 (1976). We conclude that the district court clearly erred in upholding the stop under Oregon law.

## V.

### Federal Law

The Supreme Court has twice reviewed the legality of roving stops made without any reasonable suspicion of criminal activity regarding the vehicle, its occupants, or its contents, and in both instances held the stops illegal. *See Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). These cases recognize that stopping a vehicle constitutes a Fourth Amendment seizure, which calls for a balancing of the public's privacy interests against legitimate governmental interests to determine wheth-

er the seizure was "reasonable." *Prouse*, 440 U.S. at 653–54, 99 S.Ct. at 1395–1396; *Brignoni-Ponce*, 422 U.S. at 878, 95 S.Ct. at 2578–2579. In both cases, the Court's balancing analysis resulted in the subordination of vital and legitimate government interests to the public's interest to be free from unreasonable government intrusions.

### A. Intrusiveness of the Stop

■ The privacy intrusion must be measured in terms of both the objective intrusion (*i.e.*, the stop, the questioning, and the visual inspection) and the subjective intrusion (*i.e.*, the generating of concern or fright on the part of lawful travelers). *See Prouse*, 440 U.S. at 656–57, 99 S.Ct. at 1397–1398; *United States v. Watson*, 678 F.2d 765, 767 (9th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982).

We recognize that the objective intrusion caused by stopping a vehicle is minimal. *Accord Brignoni-Ponce*, 422 U.S. at 880, 95 S.Ct. at 2579–2580 ("The intrusion is modest."). To say that the roving stop caused only a modest intrusion, however, does not conclude our Fourth Amendment analysis. The Fourth Amendment's reasonableness standard requires an examination of other critical factors.

■ One of those factors—indeed, perhaps the most critical factor in this inquiry—is the subjective intrusion caused by a roving patrol. The government argues that the subjective intrusiveness of the stop was minimal,[8] analogizing the public's privacy interest while visiting national parks to that of those engaged in pervasively-regulated industries. *See, e.g., Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (upholding warrantless search of mine pursuant to Federal Mine Safety and Health Act of 1977); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct.

---

8. The government cites *United States v. Martinez-Fuerte*, 428 U.S. at 558, 96 S.Ct. at 3083, which addressed the legality of a checkpoint stop. The Court in *Martinez-Fuerte* noted that the objective intrusion caused by roving-patrol stops is comparable to that caused by check-

point stops. It added, however, that it viewed "checkpoint stops in a different light [from roving-patrol stops] because the subjective intrusion ... is appreciably less in the case of a checkpoint stop." *Id.*

1593, 32 L.Ed.2d 87 (1972) (upholding warrantless search of gun retailers made pursuant to Gun Control Act of 1968); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (recognizing lawfulness of warrantless searches of liquor licensees made pursuant to federal statute). The analogy implies that the public's expectation of privacy in national parks is slight.

■ The government's analysis of the subjective intrusion is flawed in several significant respects. First, we reject the implication that the public's expectation of privacy while visiting our national parks is so diminished as to obviate the need for compliance with recognized Fourth Amendment requirements. It is true that the government regulates park activities. To conclude, however, that these regulations and a public awareness of them generate an implied waiver of Fourth Amendment protections overlooks the philosophy that underlies the establishment of national parklands.[9] Not only are our parks dedicated to the preservation of scenic resources, they are also dedicated to "the benefit and enjoyment of the people." *See, e.g.,* Act of March 1, 1872, ch. 24, 17 Stat. 32 (establishing Yellowstone as a national park). *See generally* J. Sax, *Mountains Without Handrails* (1980). Frederick Law Olmsted, an early supporter of the national park system,

envisioned that the parks would "get the visitor outside the usual influence where his agenda was preset, and to leave him on his own, to react distinctively in his own way and at his own pace." J. Sax, *supra,* at 24. Professor Sax describes one of the roles of the national parks: "The setting of the national park provides an opportunity for respite, contrast, contemplation, and affirmation of values for those who live most of their lives in the workaday world." *Id.* at 42.[10] In light of the fact that Congress established national parks in part to preserve for people a setting for respite and reflection, there is irony in the contention that federal regulations governing the use and management of the parks so pervasively control their use as to cause a diminished expectation of privacy. Such a rationale undercuts one of the primary purposes of our national parks by compromising the visitors' fundamental right to be left alone.

The government's analogy to the pervasively-regulated industry exception to the usual Fourth Amendment requirements is inapt, and its reliance on *Biswell* and *Colonnade Catering Corp.* misplaced.[11] The Supreme Court has described these cases as "responses to relatively unique circumstances." *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 313, 98 S.Ct. 1816, 1821, 56 L.Ed.2d 305 (1978). It reasoned that:

> Those Human Rights include the right to put one's face in clear, pure water, to discover the wonders of sphagnum moss, and to hear the song of whippoorwills at dawn in a forest where the wilderness bowl is unbroken.

Douglas, *Wilderness and Human Rights,* in *Wilderness: America's Living Heritage* 15 (D. Brower ed. 1961).

**9.** Although we recognize that our national parks and forests are managed by different federal agencies and serve somewhat different functions, these differences are of no significance in the analysis of Fourth Amendment protections in this case.

**10.** In an essay about the relationship between wilderness areas and human rights, Justice Douglas wrote:

> Man's pursuit of happiness, which Jefferson made the concern of government in our Declaration of Independence, must be our concern. While man needs a full rice bowl, he also needs more. His chief destiny is not to satisfy his physical needs. Man is a spiritual being. By our Bill of Rights we have placed many of his civil rights beyond the reach of government. We need to expand our conception of man's liberty, enlarge his individual rights, and give them priority over Science.

**11.** In *Almeida-Sanchez v. United States,* 413 U.S. 266, 270–71, 93 S.Ct. 2535, 2538–2539, 37 L.Ed.2d 596 (1973), a case involving the legality of a roving border patrol search of defendant's car, the Court rejected the government's argument that the government interest in apprehending illegal aliens made the case analogous to the administrative search cases. In concurrence, Justice Powell wrote, "More closely in point [than *Biswell* and *Colonnade Catering Corp.*] ... are the cases involving automobile searches." *Id.* at 281, 93 S.Ct. at 2543. That comment is equally applicable here.

Certain industries have such a history of government oversight that no reasonable expectation of privacy, see *Katz v. United States,* 389 U.S. 347, 351–352 [88 S.Ct. 507, 511–512, 19 L.Ed.2d 576] (1967), could exist for a proprietor over the stock of such an enterprise. Liquor (*Colonnade*) and firearms (*Biswell*) are industries of this type; when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation.

Industries such as these fall within the "certain carefully defined classes of cases," referenced in *Camara* [*v. Municipal Court*], 387 U.S. [523] at 528 [87 S.Ct. 1727 at 1730, 18 L.Ed.2d 930]. The element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision. . . . "[B]usinessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, whereas the petitioner here was not engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him." *Almeida-Sanchez v. United States,* 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973).

*Id.* These cases premise the relaxation of traditional Fourth Amendment requirements on a consent implicit in a businessman's participation in a regulated industry. *See also United States v. Raub,* 637 F.2d 1205, 1209–10 (9th Cir.1980). The Supreme Court twice has rejected suggestions that this implicit consent theory justifies roving stops of motorists. Although one who travels the highways presumably knows of licensing and vehicle safety requirements, use of the highway with awareness of those restrictions cannot be read as a consent to be stopped on a random basis. *See Prouse,* 440 U.S. at 655–61, 99 S.Ct. at 1397–1400. Similarly, "[o]ne who merely travels in regions near the borders of the country can hardly be thought to have submitted to inspections [and random stops] in exchange for a special perquisite." *Almeida-Sanchez,* 413 U.S. at 281, 93 S.Ct. at 2543 (Powell, J., concurring).

Moreover, administrative action raising serious constitutional questions must explicitly be authorized by proper authority. In *Balelo v. Baldridge,* No. 81–5806, slip op. at 94, (9th Cir. Jan. 5, 1983) we recently held invalid regulations of the Secretary of Commerce requiring the boarding and stationing of government agents on tuna ships, in order to allow the incidental·taking of porpoise during fishing operations, because the searches raised serious constitutional questions and were not expressly authorized by statute. We pointed out that in each pervasively-regulated industry case upholding a warrantless search,

the inspection was expressly authorized by statute. *See Donovan v. Dewey, supra,* 452 U.S. at 596 [101 S.Ct. at 2536]; *United States v. Biswell, supra,* 406 U.S. at 311–12 [92 S.Ct. at 1594]. The statute in each case was a critical factor in the Court's determination that an exception to the warrant requirement was appropriate. In *Biswell,* the Court stated that "the legality of the search depends not on consent but on the authority of a valid statute." 406 U.S. at 315 [92 S.Ct. at 1596]. In *Donovan v. Dewey,* the Court explained that an exception to the warrant requirement can be recognized only when a "statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant." 452 U.S. at 603 [101 S.Ct. at 2540].

*Balelo,* slip op. at 99. Here, random checks of vehicles in national parks raise serious constitutional questions, but the government has failed to indicate that the procedure has been authorized by statute.

■ A critical distinction between the regulated industry cases and *Prouse* and *Brignoni-Ponce* involves the purposes underlying both the intrusive conduct at issue and the administrative schemes which called for the intrusions. In the regulated industry cases, the Court has been influenced by the fact that the warrantless in-

trusions were designed to prevent or correct harmful conditions; possible penal consequences were only incidental and secondary. *Accord Tourtillott,* 618 P.2d at 435, 439–40 (Linde, J., dissenting). However, in *Prouse* and *Brignoni-Ponce,* as here, the purpose of the intrusion was to detect possible criminal activity. Applying that distinction here, this case is even less appropriate than *Prouse* for application of the regulated-industry exception. In *Prouse,* the government asserted its legitimate objective of assuring the safe operation of motor vehicles as justification for the random stop. Only the lone dissenter in *Prouse* accepted that argument. Yet, even he acknowledged that "a random license check of a motorist operating a vehicle on highways owned and maintained by the State is quite different from a random stop designed to uncover violators of laws that have nothing to do with motor vehicles." 440 U.S. at 665, 99 S.Ct. at 1402 (Rehnquist, J., dissenting). Here, the government sought only to collect information and check for compliance with woodcutting and hunting regulations.[12] For these reasons, we reject any suggestion that law enforcement officers were not required to adhere to established Fourth Amendment requirements in this case.

 There is yet another flaw in the government's analysis of the subjective intrusion caused by roving-patrol stops. On two occasions the Court has found vehicle stops by roving patrols too intrusive to be constitutionally permissible. *See Prouse,* 440 U.S. 648, 99 S.Ct. 1391; *Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574. The intrusion in this case is indistinguishable. The physical and psychological intrusion caused by this type of random stop "to conduct a brief interview" and "to check for possible game violations" is no less intrusive than a stop by a highway patrolman to conduct a license and registration check. *Prouse,* 440 U.S. at 657, 99 S.Ct. at 1398. It may be

true that Munoz was not signaled to stop by flashing red lights and that his vehicle was the only one in the area, but it is debatable whether motorists subjected to such stops experience any less anxiety. These stops interfere with freedom of movement, are inconvenient, and consume time. As the Court admonished in *Prouse:*

> Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry v. Ohio, supra,* recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.

440 U.S. at 662–63, 99 S.Ct. at 1401. We hold that individuals do not lose these interests anytime they drive in national parks.

*B. Government Interests*

In assessing the strength of the government's interests, courts must ascertain whether the government could employ less intrusive alternatives. *See id.,* 440 U.S. at 659, 99 S.Ct. at 1399; *Watson,* 678 F.2d at 768.

 The government claims important interests in this case. Its collection of user information will promote effective management of the park, and its efforts to preserve the park's animal and plant resources will ensure that they are available for future visitors to enjoy. Nonetheless, these legitimate concerns can be protected by less intrusive means. Park officials could solicit user information by distributing questionnaires at park entrances and exits. Although this procedure would not provide information about park misuse in a manner that might permit official response, witnesses of park misuse will often take it

---

**12.** It is unnecessary to decide whether the stop would have been lawful if the officers had first seen that Munoz was carrying wood. We must adjudge the legality of the stop based on the circumstances known to them when they decided to stop him, not on the basis of information

that might have been known to them if they had waited an instant longer. *See generally Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920).

upon themselves to inform park officials of their observations. Park officials could check woodcutting permits by requiring woodcutters to display their permits in a prominent place while carrying wood in their vehicles, or by restricting woodcutting to designated areas and then checking permits on the cutting site. Similarly, officials could check for compliance with game and hunting regulations by stopping hunters in the field or at checkpoints. Indeed, Oregon's game officials have previously employed roadside checkpoints for this very purpose. See Tourtillott, 618 P.2d at 424–25.

In addition, it is not altogether clear that stopping vehicles promotes the asserted government interests. Because a motorist could not actively misuse park resources while driving lawfully on park roads, vehicle stops can have no preventive purpose, other than a possible deterrent effect. It is not clear that the deterrent function would be well served by presenting the public with the risk of being stopped. See Prouse, 440 U.S. at 660, 99 S.Ct. at 1399. Instead, the stops have as a primary purpose the detection of completed criminal activity. Such investigative stops must be based on individualized suspicion. See Brignoni-Ponce, 422 U.S. at 884, 95 S.Ct. at 2581–2582. Numerous factors can be considered to determine whether reasonable suspicion to stop a car exists. Officers can consider the characteristics of the area in which they encounter a vehicle, information about recent illegal activity in the area, the driver's behavior, and characteristics of the vehicle. Cf. id. at 884–85, 95 S.Ct. at 2581–2582 (enumerating similar considerations regarding reasonable suspicion to stop a car in a border area to check for illegal aliens). In all situations, the officer is entitled to assess the facts in light of his special experience in detecting game violations. See Terry v. Ohio, 392 U.S. at 27, 88 S.Ct. at 1883. It is clear that the government could use less intrusive alternatives than stopping all vehicles encountered by roving patrols.

## CONCLUSION

The pervasively-regulated industry exception to usual Fourth Amendment re-

quirements is inapplicable here. Consequently, the balance between the intrusiveness of a roving stop not based on any individualized suspicion and the legitimate government interests weighs in favor of outlawing roving stops regardless of whether they are randomly or universally applied. The fruits of Munoz's stop should have been excluded from trial.

Although we find Munoz's criminal deeds despicable, we are reminded of the words of Justice Frankfurter in dissent in United States v. Rabinowitz, 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950):

> It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people. And so, while we are concerned here with a shabby defrauder, we must deal with his case in the context of what are really the great themes expressed by the Fourth Amendment.

The Fourth Amendment guarantees the right to enjoy the grandeur and tranquility of our national parks without unreasonable encumbrance. We hold that roving vehicle stops without founded suspicion violate those Fourth Amendment rights.

REVERSED.