STATE of Iowa, Appellant,

v.

Gary L. KEEHNER, Appellee.

No. 87–1012.

Supreme Court of Iowa.

June 15, 1988.

As Corrected June 30, 1988
and Aug. 15, 1988.
As Corrected Aug. 18, 1988.

Thomas J. Miller, Atty. Gen., and Bruce Kempkes, Asst. Atty. Gen., and John W. Hofmeyer III, Asst. Co. Atty., for appellant.

R.L. Van Veldhuizen, Oelwein, for appellee.

SNELL, Justice.

On February 24, 1987, a judicial magistrate found defendant, Gary L. Keehner, guilty of carrying a loaded gun in a vehicle on a public highway. *See* Iowa Code

§ 110.36 (1987). Keehner's motion to suppress evidence regarding the charge was denied. Keehner appealed his conviction to the district court. *See* Iowa R.Crim.P. 54. That court found merit in Keehner's suppression arguments, granted the motion and reversed his conviction because of insufficient evidence. We then granted the State's application for discretionary review. *See* Iowa Code § 814.5(2) (1987).

Keehner grounded his suppression motion in what he characterized as a seizure which violated his rights as secured by state and federal constitutions. *See* U.S. Const. amends. IV, XIV; Iowa Const. art. 1, § 8. This illegal seizure occurred, he contends, when Conservation Officer Keith Rowley stopped Keehner's pickup truck and asked to see his hunting license. Subsequently, it was discovered that Keehner's gun contained shells in the magazine, contrary to statutory prohibition. *See* Iowa Code § 110.36 (1987). Officer Rowley then issued Keehner a citation for the violation, and this action began.

The question now raised is what standard is applicable to an investigatory stop of a motor vehicle made by a conservation officer in performing his job. Officer Rowley conceded that at the time of the stop he did not have specific and articulable cause to believe that criminal activity was afoot. Consequently, Keehner argues that the stop was unconstitutionally made and the seized evidence properly suppressed, necessitating his acquittal.

Officer Rowley's testimony indicated that he was not making random, indiscriminate stops of the general public nor was this a roadblock stop of all vehicles. *See generally State v. Hilleshiem*, 291 N.W.2d 314 (Iowa 1980). Rowley was not acting on some subjective theory that a specific crime was being committed that justified the stop. Rather, his testimony showed a specific reason for stopping Keehner and the background information leading up to it.

From December 13, 1986, through January 1, 1987, James Lein, a farmer living in Smithfield Township in Fayette County, observed one or two pickup trucks on his or his neighbor's property nearly every day.

Around dusk on Saturday, December 13, he saw four men in trucks, that were equipped with citizens band antennas, on his property. One person, dressed in white, had a scope in the window and was "glassing" the area. It appeared to Lein they were fox hunters. Later in the day, he saw the same pickup with another parked on the road. Four people were there. One person had a scope aimed out into the field where another person was walking dressed in a white uniform carrying a rifle. Both pickups had citizens band antennas on them. (Iowa Code section 109.24 prohibits use of a mobile phone transmitter to communicate with other hunters while hunting.)

Lein obtained the license plate numbers of the pickup trucks, one a Chevy, the other a Ford. It was subsequently determined that the former belonged to Keehner. Lein checked with his neighbors and found that none had authorized hunting on their properties. He called Officer Rowley's home, failed to reach him, and then called the sheriff's office. The incident and license numbers were described to the personnel at the sheriff's office, Lein telling them "there was alleged poaching in process." He was told they would get in touch with the conservation department. On Wednesday of the following week Lien personally gave Officer Rowley the same information. He also called him other times before the first of the year when he saw the pickup in the area. The last time he talked to Officer Rowley was December 23rd.

Keith Rowley has been a conservation officer for twenty-one years, having received the same training as do police officers at the Iowa Law Enforcement Academy. On December 2, he received a tip hotline report alleging illegal deer hunting by Keehner. He was aware of the communication by Lien to the sheriff's department. *See United States v. Cooper*, 733 F.2d 1360, 1364–65 (10th Cir.) (officer's knowledge of defendant's circumstantial links to prior suspicious activity in area of stop relevant in reasonableness balance), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984).

On January 1, 1987, Officer Rowley was working about four miles from Lien's residence. He observed a dark pickup proceeding very slowly on the road about ten o'clock in the morning. He thought it was the one he was looking for. When the pickup stopped at the side of the road, Officer Rowley circled around the section. In proceeding toward the pickup again, he saw that it was still stopped. With a spy scope, he determined someone in the pickup was "glassing the field." The area was a prairie frequented by fox hunters. When Officer Rowley came to an intersection, the pickup started moving toward him. Officer Rowley then put on his red lights and stopped the pickup.

The pickup was a late model Chevrolet, black in color, with additional head lights on the front. Officer Rowley recognized it as Keehner's pickup from having seen it before. Officer Rowley got out of his vehicle, approached the cab of Keehner's pickup, saw him turn on a portable tape recorder and heard him say "I have been advised to do this." Two dead red fox were clearly visible in the pickup box. On the pickup seat were a spotting scope, a pair of binoculars and some white clothing.

Officer Rowley asked to see Keehner's hunting license or his fur harvester's license. Keehner refused. Officer Rowley asked again and was met with the question: "First of all, why did you stop me." Officer Rowley pointed out that Keehner had been stopped by the roadside and added that he thought he was hunting. Keehner told him he lived nearby. After being told it takes a fur harvester's license to possess fox, Keehner produced a license.

Officer Rowley then said he was going to check his gun to see if it was loaded. Keehner's cased gun was lying on the passenger's seat. Officer Rowley stated that he had a right as an officer to inspect a hunter. Keehner immediately argued that the officer didn't have probable cause to stop him. He further stated that stopping his vehicle and "glassing" the section doesn't mean he was hunting. Keehner refused to show his gun so Officer Rowley suggested that Keehner park his pickup and accompany him to get a search warrant. Keehner quarreled about driving his pickup back to the house, probable cause to stop him, checking his gun case, wearing a seat belt, and that Rowley was coming up with reasons after he stopped him.

Rowley finally said there are all sorts of things they can argue. Keehner said: "No I am not going to argue, as long as I have it on tape, because we are going to end up going to court, because I've got shells in—not loaded into the chamber, it is not bolted, but there are shells in the magazine." Keehner then showed him the gun. Rowley told him to give him one of the shells. Keehner said: "Here's a dirty one. Hah."

On appeal from the magistrate's conviction, the district court found that the conduct observed by officer Rowley was consistent with bird watching, sightseeing, checking on crops, hunting and the identification of favorable areas to hunt in at a later time. The court said:

> "Based on his observations, it can fairly be said officer Rowley did not stop an individual who was hunting in order to determine if the individual was hunting legally. Rather, the officer stopped an individual who was driving a motor vehicle to determine if the individual was hunting and then, if he was hunting, to see if he was doing so legally."

The district court concluded that Officer Rowley did not have adequate grounds to reasonably believe that Keehner was hunting, legally or illegally. This finding preempted a consideration of the constitutionality of the stop, the validity of the search, and the issue of consent to search.

In *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the United States Supreme Court struck as violative of the fourth amendment random automotive stops that are supported by neither probable cause nor reasonable suspicion. Justices Blackman and Powell, in a concurring opinion, made the following comments regarding their understanding of the majority opinion:

> And I would not regard the present case as a precedent that throws any constitu-

tional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different.

*Id.* at 664, 99 S.Ct. at 1401, 59 L.Ed.2d at 674. *Prouse* also reiterated the pertinent analytical framework, noting that the constitutional permissibility of a particular law enforcement practice is determined by balancing its intrusion on the individual's fourth amendment interests against its promotion of legitimate governmental interests. *Id.* at 654, 99 S.Ct. at 1396, 59 L.Ed. 2d at 667–68. The purpose of this balance is to assure that the individual's reasonable expectation of privacy is not subject to the unbridled discretion of the officer in the field. *Id.* at 655, 99 S.Ct. at 1396–97, 59 L.Ed.2d at 667.

In applying this framework, courts have generally required some quantum of individualized suspicion as a prerequisite to a constitutional search or seizure. *United States v. Martinez–Fuerte,* 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116, 1130 (1976); *Hilleshiem,* 291 N.W.2d at 317. However, the fourth amendment imposes "no irreducible requirement of such suspicion." *Martinzez–Fuerte,* 428 U.S. at 561, 96 S.Ct. at 3084, 49 L.Ed.2d at 1130; *State v. A–1 Disposal,* 415 N.W.2d 595, 598 (Iowa 1987); *Hilleshiem,* 291 N.W.2d at 317. The touchstone, as in all fourth amendment cases, is the requirement of reasonableness. *See, e.g., Prouse,* 440 U.S. at 653–54, 99 S.Ct. at 1396, 59 L.Ed.2d at 667.

The stop of Keehner's truck here clearly constitutes a "seizure" within the fourth and fourteenth amendments even though the purpose of the stop was limited and the resulting detention quite brief. *See, e.g., Prouse,* 440 U.S. at 653, 99 S.Ct. at 1396, 59 L.Ed.2d at 667; *see also* Iowa Code §§ 107.13, 111.26 (1985) (state conservation officers endowed with "the same powers that are conferred by law on peace officers in the enforcement of the laws ... and the apprehension of violators."). Accordingly,

we must determine whether the seizure was constitutionally reasonable. As concerns Keehner and other similarly situated individuals, the United States Supreme Court has recognized "the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop," and has accorded this interest substantial weight. *Prouse,* 440 U.S. at 657, 99 S.Ct. at 1398, 59 L.Ed.2d at 670.

The present case, however, is distinguishable from *Prouse, Hilleshiem,* and other cases which rely on this interest as here the stop was, in fact, not truly "random." Rather, the stop here resulted from the statutory authority granted to conservation officers to request and inspect hunting licenses. Iowa Code section 110.19 provides, in part, that "[e]very person shall, while ... hunting ... show the person's license, certificate or permit, to any peace officer ... when requested by said persons to do so." Iowa Code section 109.1(8) defines "hunt" broadly to include "any pursuing ... searching for ... stalking or lying in wait for any game...." The record discloses that Officer Rowley observed Keehner "glass" a snow-covered field with a scope from his truck while stopped on a country road. Keehner then proceeded to drive his truck toward Officer Rowley. Certainly, Keehner's conduct could reasonably be interpreted by Officer Rowley as "hunting" within the statutory definition. Keehner conceded this point in his district court brief. In this vein, we believe deference should properly be accorded to an officer's ability to assess a factual situation in light of his or her special experience in detecting game violations. *Cf. Terry v. Ohio,* 392 U.S. 1, 17, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968) (reasonableness determination must accord weight to inferences which officer draws from facts in light of his or her experience). Consequently, Officer Rowley was authorized by statute to request to see Keehner's license. It matters not, we think, that Keehner's conduct may also be consistent with activities other than hunting. *See, e.g., United States v. Black,* 675 F.2d 129, 137 (7th Cir.1982) ("[i]t must be rare indeed that an

officer observes behavior consistent *only* with guilt and incapable of innocent interpretation." (quoting *United States v. Price,* 599 F.2d 494, 502 (2d Cir.1979)), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); 1 LaFave, *Search and Seizure* § 9.3(b), at 432–33 & n. 58 (1987).

In addition, we do not believe Keehner's interest in the inviolableness of his situation to be completely reasonable. We presume our citizen's knowledge of applicable law. *E.g., Millwright v. Romer,* 322 N.W.2d 30, 33 (Iowa 1982). This law requires hunters to display their licenses on request while hunting. Iowa Code § 110.19 (1987). Accordingly, an individual engaging in activity that may reasonably be interpreted as hunting, knows that he or she may be stopped briefly and asked to display a license. *Cf. A–1 Disposal,* 415 N.W.2d at 599 (regulated individuals presumed to know nature of regulations). Expectations to the contrary are unreasonable. Those expectations become no more reasonable if the hunter conducts the regulated activity from a vehicle. In sum, we are reluctant to attribute weight to an individual's desire to do his or her public hunting in private.

Against this, we balance the State's interest in regulating its wildlife and the hunting thereof. The substantial nature of this interest has been acknowledged, *State v. Tourtillott,* 289 Or. 845, 859, 618 P.2d 423, 429–30 (1980), *cert. denied,* 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 352 (1981); *State v. Halverson,* 277 N.W.2d 723, 725 (S.D.1979), as has the difficulties involved in the enforcement of a state's game licensing and regulation statutes, *Tourtillott,* 289 Or. at 858, 618 P.2d at 430; *Halverson,* 277 N.W.2d at 724 ("[T]he number of hunters is large and game officers few."). Relatedly, we note that several courts which have stricken stops as unconstitutional have done so in part due to the perceived existence of less intrusive alternatives. *See Prouse,* 440 U.S. at 659–61, 99 S.Ct. at 1399–1400, 59 L.Ed.2d at 670–72; *United States v. Munoz,* 701 F.2d 1293, 1300–01 (9th Cir.1983). However, in the context of the enforcement of our state's hunting regulations, and specifically the requirement of license demonstration involved here, we can conceive of no such options. The standard we apply today also contains its own limitation so as not to commit the seizure to the unfettered discretion of the officer: In order to be stopped, the individual must first be engaged in an activity which may be reasonably interpreted as "hunting." *See* Iowa Code § 110.19 (1987). We think the balance favors the position advanced by the State and hold that the stop of Keehner did not violate his rights secured by the fourth and fourteenth amendments.

■ In addition, we do not believe the situation which led to the discovery that Keehner's gun was in violation of statute constituted an unconstitutional search. Rowley observed two dead foxes in Keehner's pickup truck. The "glassing" of the prairie after slowly driving the road conformed to the modus operandi of fox hunters known to Rowley. Keehner was possessed of a fur harvester's license, a scope, binoculars and white clothing.

Officer Rowley was in a place he had a right to be performing his duty to enforce hunting laws. Among those duties is the checking of guns transported in vehicles. He had the right and duty to check a hunter's gun and magazine to see if a violation had occurred. No unreasonable search of a gun and magazine can be postured from the fact that a violation of the gun transporting law could not be seen. To require a search warrant before a conservation officer could check a hunter's gun enclosed in a zippered case would render these laws virtually unenforceable. We know of no constitutional reasoning that mandates such a result. The search was proper with or without Keehner's consent.

Anticipating our possible disagreement with the district court on the constitutional issue, Keehner argues that such a result would not affect him. Citing several of our double jeopardy cases, he contends that a constitutional bar prohibits his reprosecution. Such may be the case; however, and notwithstanding our finding of error, we do not believe a reprosecution is necessary.

■ Under the federal constitution, the double jeopardy clause is not offended by government appeals absent the threat of either multiple punishment or successive prosecutions. *United States v. Wilson*, 420 U.S. 332, 344, 95 S.Ct. 1013, 1022, 43 L.Ed.2d 232, 242 (1975). The clause does not bar government appeals where those appeals would not require a new trial. *Id.* at 342, 95 S.Ct. 1013 at 1021, 43 L.Ed.2d 232 at 241. For purposes of the present issue, we hold that principles underlying the analysis under the federal constitution apply under the Iowa Constitution as well. *See State v. Chase*, 335 N.W.2d 630, 632 (Iowa 1983); *State v. Bell*, 322 N.W.2d 93, 94 (Iowa 1982), *cert. denied*, 459 U.S. 1210, 103 S.Ct. 1204, 75 L.Ed.2d 445 (1983). Consistent with these principles, the double jeopardy clause does not bar further review of an intermediate appellate court's order reversing a conviction even when the appellate court has ordered the indictment dismissed and the defendant discharged. *Forman v. United States*, 361 U.S. 416, 426, 80 S.Ct. 481, 487, 4 L.Ed.2d 412, 419, *reh'g denied*, 362 U.S. 937, 80 S.Ct. 749, 4 L.Ed.2d 751 (1960); *see Wilson*, 420 U.S. at 345, 95 S.Ct. at 1022, 43 L.Ed.2d at 242. Since reversal on appeal would merely reinstate the jury's verdict, the double jeopardy guaranty is not offended. *See Wilson*, 420 U.S. at 344–45, 95 S.Ct. at 1022, 43 L.Ed.2d at 242.

■ This case was originally tried to a judicial magistrate who found Keehner guilty as charged. Implicit in the district court's subsequent "reversal" of Keehner's conviction is the fact that the court was sitting in its appellate capacity. *See* Iowa R.Crim.P. 54(3). A 1982 revision of rule 54 provided that appeals such as Keehner's are not tried de novo in the district court. *See* 1982 Iowa Acts ch. 1269. Although the district court may allow further evidence if it finds the record inadequate, it did not do so in this case. Consequently, Keehner's appeal was decided on the record with briefs and, because the court so opted, oral argument. *See* Iowa R.Crim.P. 54(3). Similar to the appeal of indictable offenses originally tried in the district court, findings of fact made by the magistrate in the original action were binding on the judge deciding the appeal in the district court if they were supported by substantial evidence. *Compare* Iowa R.App.P. 4, 14(f)(1) *with* Iowa R.Crim.P. 54(3).

Our reversal of the district court's judgment merely reinstates the verdict reached by the judicial magistrate. This will not subject Keehner to a second trial and, therefore, does not violate the constitutional prohibition that no person "shall after acquittal be tried for the same offense." Iowa Const. art. I, § 12. The magistrate's decision is amply supported by the record and fully consonant with our law. Accordingly, we reverse the judgment of the district court and remand this case to the district court with directions to affirm the conviction.

REVERSED AND REMANDED WITH DIRECTIONS.

SCHULTZ, Justice (concurring specially).

Although I agree with the majority's disposition of this case, I believe that it overstates the power of conservation officers to conduct searches to determine whether persons are transporting loaded guns in their vehicles. The majority opinion states that a conservation officer has "the right and duty to check a hunter's gun and magazine to see if a violation had occurred." While I agree that the officer in this case acted properly, the fourth amendment does not allow this type of search under any set of circumstances as the majority opinion suggests.

Once it is determined that the initial investigatory stop was lawful, the issue becomes quite narrow: When a conservation officer makes a lawful stop of a vehicle and sees a gun case in plain view, may that officer check to see if the gun in the case is loaded even though he has no reasonable basis to believe that it is loaded and has no reason to believe that he is in any danger? I conclude that this type of search is reasonable under the fourth amendment.

It should be pointed out that, given the lawfulness of the initial stop, the officer's observation of the gun does not implicate

fourth amendment concerns because observation of an item in plain view is not a search. *Texas v. Brown,* 460 U.S. 730, 738 n. 4, 103 S.Ct. 1535, 1541 n. 4, 75 L.Ed.2d 502, 511 n. 4 (1983). Thus, fourth amendment concerns were not implicated until the officer checked the gun to see if it was loaded. It is the intrusion caused by checking the gun that must be analyzed.

The constitutionality of this search depends upon a balancing of the degree of intrusion on defendant's privacy interests against the State's interest in enforcing its own legitimate governmental interests. *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667–68 (1979); *State v. A–1 Disposal,* 415 N.W.2d 595, 598–99 (Iowa 1987).

Under the facts of this case, the intrusion on defendant's privacy interests was minimal. He had already been lawfully stopped by the officer and been required to show his fur harvester's license. The gun case was in plain view of the officer and was located in defendant's vehicle. Case law is clear that a person has a lesser expectation of privacy in the passenger compartment of a vehicle than in a home or office. *See New York v. Class,* 475 U.S. 106, 112–13, 106 S.Ct. 960, 965, 89 L.Ed.2d 81, 89–90 (1986); *California v. Carney,* 471 U.S. 386, 390–93, 105 S.Ct. 2066, 2068–70, 85 L.Ed.2d 406, 412–14 (1985). One court has held that by applying for a license, a hunter tacitly consents to a checkpoint vehicle stop to check for game. *See State v. Halverson,* 277 N.W.2d 723, 724–25 (S.D.1979). While the hunter's license application may not constitute implicit consent to a search of this type, it is a legitimate factor to consider in determining the defendant's expectation of privacy. Similarly in a vehicle weight violation case, we considered the motor carrier's knowledge of our weight and road regulations in determining the reasonableness of the State's intrusion by a stop for a weight inspection without any reasonable suspicion of criminal activity. *A–1 Disposal,* 415 N.W.2d at 600.

Against this minimal intrusion, we must balance the State's interest in enforcing its wildlife and game laws. The Oregon Supreme Court, in a case involving a roadblock for checking game law violations, stated:

> [T]he governmental interest in the enforcement of laws for the preservation of wildlife in this state is sufficiently substantial to justify the minimal intrusion upon the Fourth Amendment rights of those stopped for brief questioning and a visual inspection of their vehicles.

*State v. Tourtillott,* 289 Or. 845, 859, 618 P.2d 423, 430 (1980). Under the facts of this case, I believe that the State's interest is substantial enough to outweigh the slight impairment of defendant's privacy interests. I agree that the search was reasonable.

Instead of analyzing the issue according to the principles outlined above, the majority suggests that checking a person's gun to see if it is loaded is proper under all circumstances. Ordinarily, to be reasonable under the fourth amendment, a search must be premised on some reasonable suspicion. *Delaware v. Prouse,* 440 U.S. 648, 654–55, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667–68 (1979); *United States v. Munoz,* 701 F.2d 1293, 1301 (9th Cir.1983) (investigatory stop by roving game officers must be based on individualized suspicion when primary purpose is detection of criminal activity). I have serious doubts whether a game officer has authority to stop vehicles in order to check for a loaded gun when there is no reason to suspect that a violation exists. *Munoz,* 701 F.2d at 1301; *Commonwealth v. Palm,* 315 Pa.Super. 377, 383, 462 A.2d 243, 246 (1983).

The result reached by the majority is correct. However, in reaching that result, the majority opinion grants more authority to conservation officers than the fourth amendment allows and does so by addressing a broader issue than the facts require. For these reasons I am not able to join in that part of the opinion dealing with this issue.

NEUMAN, Justice (concurring specially).

I concur in the majority's reinstatement of defendant's conviction but I depart from

its gratuitous assertion that the search of defendant's gun case "would have been proper with or without Keehner's consent." Nor can I join the advisory opinion offered by Justice Schultz' special concurrence.

The facts reveal that Keehner, albeit reluctantly, consented to the inspection of his cased gun. Given this circumstance, there is no reason to use this case as a vehicle for granting conservation officers carte blanche to search hunters without regard to the customary prerequisites for warrantless searches. I think even Officer Rowley would be surprised at the allowance of such an unconstitutional intrusion. He requested that Keehner accompany him to obtain a warrant rather than force the issue. This court would be wise to follow his conservative lead.

McGIVERIN, C.J., and LAVORATO, J., join this special concurrence.