462 A.2d 243

**COMMONWEALTH of Pennsylvania**

v.

**Mark Steven PALM and Edward Eugene Zendt, Appellants.**

Superior Court of Pennsylvania.

Argued Sept. 22, 1981.

Filed May 20, 1983.

Reargument Denied Aug. 2, 1983.

Petition for Allowance of Appeal Denied Jan. 16, 1984.

378

Allen E. Hench, Newport, for appellants.

R. Scott Cramer, Assistant District Attorney, Duncannon, for Commonwealth, appellee.

380

Before BROSKY, McEWEN and BECK, JJ.

McEWEN, Judge:

Appellants were charged with a violation of the Pennsylvania Game Law by the unlawful killing of a deer out of season [1], and convicted as charged before a District Justice. A summary appeal proceeding was taken and after a trial de novo appellants were found guilty. The court entered an order which dismissed the appeal and reimposed the sentence imposed by the District Justice.

Appellants present in their brief the following Statement of Questions:

I. Is probable cause necessary for a Game Commission Officer to stop and seize a vehicle in the course of investigating a suspected Game Law violation?

II. Do Game Law Enforcement Officers have probable cause to stop and seize a vehicle observed near an area later in time than the possible occurrence of a suspected violation?

III. Should Game Law Enforcement Officers give *Miranda* warnings before a custodial and accusatory interrogation regarding a suspected Game Law Violation?

IV. Is a search of a vehicle stopped to investigate a suspected Game Law violation proper where no probable cause for a stop existed and no free or unconstrained consent was given?

The quite careful opinion of distinguished President Judge Keith B. Quigley, provides a fine analysis of the fundamental issues presented and we share his views that game protectors must have reasonable suspicion to stop a vehicle and must have probable cause to search a vehicle, but we reverse for the reason that we conclude appellants were subjected to custodial interrogation by the game protectors and were, therefore, entitled to *Miranda* [2] warnings.

1. 34 P.S. § 1311.701.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The District Game Protector and his deputy supplied in their testimony a history of the occurrence. That testimony reveals that as the deputy, in full uniform, drove to investigate the sound of gunshots, a fast moving van with distinctive taillights passed him proceeding in the opposite direction, leaving tire tracks in the freshly fallen snow. The game protector followed the path of the vehicle to a location in a field where he found evidence that a deer had been killed out of season. The deputy summoned the District Game Protector who further examined the site and also concluded that a deer had been killed. As the game protectors proceeded toward the residence of one of the appellants, Mark Palm, by reason of their suspicion that the distinctive looking van belonged to Mr. Palm, the van passed them from the opposite direction. The game protectors immediately gave chase in their marked enforcement vehicle and brought the van to a halt.

Appellant Palm was the owner and driver of the vehicle and the other appellant, Edward Zendt, was in the front seat. The District Game Protector, with the aid of a flashlight, first observed the front interior of the van and saw what appeared to be blood on the hands of appellants. When the game protector inquired about the blood, appellant Palm responded that it was from an injured cow. The game protector secured the permission of appellant Palm to look in the rear of the van, where he saw "deer hair sticking up on the red carpet." As a result, the protector told appellant Palm to turn off the motor while expressing to them his belief that "[appellants] were responsible for taking the deer and ... had some problems." Appellants were further informed of certain penalties for the suspected game law violation and advised, if involved, that "it would be a lot better if [they] owned up to it."

The District Game Protector proceeded to tell appellant Palm that he "would need some information" and to "come back to my vehicle with me." In compliance with this order, appellant Palm seated himself in the front passenger seat of the enforcement vehicle, flanked to his left by the

District Protector and to his rear by the deputy protector, while appellant Zendt remained alone by the van. The District Protector initially asked appellant Palm such questions from a routine identification slip as "age, date of birth, and so on" before repeating that he "was sure [appellants] were responsible for the killing of the deer and that [appellant Palm] had some big problems," and again outlining certain penalties for violation of The Game Law. It was after further interrogation that appellant Palm admitted the unlawful killing of a deer. The game protector next instructed Palm to return to the van and to send appellant Zendt to them so that information could likewise be obtained from him. Zendt testified that he was informed by the protector that "[Palm] admitted shooting the deer" and that the deer had been crippled. Zendt thereafter confessed to involvement in the killing of the deer. *Miranda* warnings had not been supplied to either appellant.

Appellants contend that probable cause is required for the stopping or seizure of a vehicle where a game law violation is under investigation and that the trial court erred when it determined that probable cause existed for the game protectors to stop the vehicle in which appellants were traveling.

While the legality of the stop of the vehicle is justified by the specific facts of this case, it must be emphasized that any stop involves a balancing, on the one hand, of the interest of private citizens in being free from unreasonable searches and seizures with, on the other hand, the societal interests in providing for the enforcement of the law for the protection of the community. The eminent Justice Robert N.C. Nix, Jr., carefully discussed this delicate balance as he declared in *Commonwealth v. Murray*, 460 Pa. 53, 61, 331 A.2d 414, 415 (1975):

> Because a motorist's extreme mobility may otherwise allow him to avoid police confrontation, the State has an equally strong interest in these cases in stopping a moving vehicle to freeze momentarily a situation of suspected criminality. However, ... to justify the intrusion the

police officer must be able to point to specific and articulable facts which taken together with rational inferences from those facts reasonably warranted the intrusion. Thus, it is also clear that an investigative stop of a moving vehicle to be valid must be based upon objective facts creating a reasonable suspicion that the detained motorist is presently involved in criminal activity. (citations omitted).

*See also Commonwealth v. Lovette,* 498 Pa. 665, 450 A.2d 975 (1982).

■ The trial court concluded that the game protector "must have some basis before he invades legally protected interest areas of our citizens: probable cause to search; something less than that to stop." We agree and here hold that a condition precedent to the exercise of such power by game protectors is the existence of *reasonable suspicion* to stop a vehicle and *probable cause* to search the vehicle.

The Pennsylvania Game Law, in pertinent part, confers upon lawfully qualified game protectors the following power:

> To stop and inspect or search at any time, without warrant, any vehicle or conveyance, and its occupants or contents, any time or place within this Commonwealth: Provided, however, Such officer shall be in uniform and display his badge or other insignia of identification and shall state to the person in charge of said vehicle or conveyance the purpose of the inspection or search.

34 P.S. § 1311.214(h).

■ A determination of the legality of a stop and search of a vehicle by a lawfully qualified game protector begins with a consideration of the requirements of the Fourth Amendment. *See Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The United States Supreme Court declared in *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), in the context of a police stop:

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry*, [*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] recognizes that it may be the essence of good police work to adopt an intermediate response ... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*See also, Commonwealth v. LeSeuer*, 252 Pa.Super. 498, 382 A.2d 127 (1977). In *Terry v. Ohio, supra,* it was established that a law enforcement officer, to justify a particular intrusion in the absence of probable cause, "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry v. Ohio, supra* at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. *See also Adams v. Williams, supra; Commonwealth v. Murray, supra; Commonwealth v. Berry*, 305 Pa.Super. 8, 451 A.2d 4 (1982); *Commonwealth v. Merbah*, 270 Pa.Super. 190, 411 A.2d 244 (1979). The *Terry* decision proceeds to describe the objective standard to be used in making that determination:

[W]ould the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?

*Terry v. Ohio, supra* at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. We believe that this *Terry* rationale is applicable, as well, to other duly qualified law enforcement officials, including state game protectors. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (*Terry* rationale applied in context of investigatory stop of an automobile by Border Patrol); *United States v. Munoz*, 701 F.2d 1293 (9th Cir.1983) (roving vehicle stops by

Oregon game trooper without founded suspicion violates Fourth Amendment rights). Thus, a brief investigatory stop is allowable as an intermediate response when a game protector can demonstrate articulable facts and rational inferences from the facts which indicate that such a stop is appropriate.

■ Our study of the record convinces us that the game protectors provided an adequate factual basis to warrant the initial stop of the vehicle in which appellants were traveling. The game protector heard shots, observed the van of appellants coming from the direction of the shots, in an isolated rural area where no other vehicles were sighted, and followed for approximately one-half mile the tire tracks in the snow left by the van to a field where the following indicia of a violation were found: (1) broken cornstalks; (2) footprints; (3) hair thought to be from a deer; and (4) the appearance of blood. The deputy protector saw sufficient distinctive features of the van to suspect that it was owned by appellant Palm. We conclude that the facts as revealed by the record, together with all rational inferences therefrom, demonstrate such a reasonable and articulable suspicion as was sufficient to justify the stop.

■ While we conclude that the initial stop of the vehicle was valid, the game protectors did not have probable cause at that moment to search. It is well settled that probable cause to justify a search without a warrant exists only where the facts and circumstances within the knowledge of the arresting or searching officer, or of which the officer had reasonable trustworthy information, are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed. *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *Commonwealth v. Bartlett*, 486 Pa. 396, 406 A.2d 340 (1979); *Commonwealth v. Rutigliano*, 310 Pa.Super. 364, 456 A.2d 654 (1983). An officer may, however, briefly detain a suspect for questioning and then proceed to conduct an actual search if the questioning ripens into probable cause. *United States v. Pillo*, 522

F.Supp. 855, 861 (M.D.Pa.1981) (*Citing Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) and *United States v. Brignoni-Ponce, supra* 422 U.S. at 881–82, 95 S.Ct. at 2580, 45 L.Ed.2d 607). *See also Commonwealth v. Pullano,* 295 Pa.Super. 68, 440 A.2d 1226 (1982); *Commonwealth v. LeSeuer, supra; Commonwealth v. Ferraro,* 237 Pa.Super. 268, 352 A.2d 548 (1975).

■ The game protector testified that when he and his deputy stopped the appellants and viewed, with the aid of a flashlight, "something red on their hands [that] appeared to be blood ... [he] felt sure they were involved." The sum of all of the facts, from the sound of the shots through the observation of the blood on the hands of appellants provided the probable cause necessary to allow the search. *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). We conclude, therefore, that the trial court correctly concluded that there was probable cause for the search of the vehicle.

■ Appellants next assert they were subject to custodial interrogation by the game protectors and were, therefore, entitled to *Miranda* warnings. The Court in *Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* supra 384 U.S. at 444, 86 S.Ct. at 612, 16 L.Ed.2d at 706 (footnote omitted). Our venerable colleague, Judge J. Sydney Hoffman, pronounced four theorems for guidance in any study of whether an interrogation was custodial in nature when he synopsized the law of Pennsylvania upon this issue in *Commonwealth v. Anderson,* 253 Pa.Super. 334, 385 A.2d 365 (1978):

(1) The mere fact that a police investigation has focused on a particular person will not require *Miranda* warnings before police interviews with that person.

(2) If the police in fact place a person in custody or restrict his freedom in any significant way prior to, or

during the interview, the interrogators must advise the person of his *Miranda* rights.

(3) A suspect may be in custody even if the police have not taken him to a police station or formally arrested him.

(4) Custodial interrogation occurs when a suspect is placed in a situation in which he reasonably believes that his freedom of action of movement is restricted by such interrogation.

*Commonwealth v. Anderson, supra,* 253 Pa.Superior at 345, 385 A.2d at 670–71.

It must be noted during any such determination that: [M]ere focus on a subject is not automatically dispositive of custodial status, but the fact that the subject was the focus of an investigation is a relevant factor during consideration of the second and fourth theorems, namely, whether the freedom of the subject is restricted or the subject is in custody, and whether the subject could reasonably believe that his freedom of movement is restricted.

*Commonwealth v. Schoellhammer,* 308 Pa.Super. 360, 366, 454 A.2d 576, 579 (1982) (citations omitted).

An application of the *Anderson* theorems to this appeal compels the conclusions that: (1) the freedom of appellants was restricted in a significant way; and (2) an adequate factual basis existed to support a reasonable belief by appellants that their freedom of action was restricted. The following circumstances of the entire occurrence compel such conclusions: (1) the game protectors pursued the vehicle of appellants with flashing signals; (2) after the vehicle of appellants had halted, the two uniformed and armed game protectors, possessing both real and apparent authority to enforce The Game Law [3], flanked the van, probed with

---

3. The Game Law confers upon lawfully qualified game protectors the following powers, inter alia:

(1) enforce The Game Law;

(2) execute all warrants for violation of The Game Law;

(3) serve subpoenas issued for the examination, investigation and trial of all offenses against The Game Law;

a flashlight the interior of the vehicle and conducted interrogation of the occupants; (3) appellants were advised that the protectors suspected they were responsible for killing the deer; (4) the District Game Protector "told" appellant Palm to accompany him to the enforcement vehicle; (5) appellants were isolated from one another as the individual interrogation was conducted; (6) the interrogation was conducted while one protector sat next to and the other protector behind each appellant individually in the police vehicle; (7) the interrogation conducted in the protectors' vehicle went beyond routine questions of an informational nature and became accusatory; (8) the interrogation included advice of certain of the penalties for violation of The Game Law [4]; and (9) appellants had been led to believe "it would

(4) carry firearms or other weapons, concealed or otherwise, in the performance of official duty;

(5) arrest without warrant any person in the act of violating The Game Law, or in pursuit immediately following such violation;

(6) stop and inspect or search at any time, without warrant, any vehicle or conveyance and its occupants or contents, at any time or place within the Commonwealth;

(7) inspect or search at any time, without warrant, any clothing worn by any person, or any boat, conveyance or other vehicle of any type or kind, or any receptacle for game, or any hunting party roster or any camp, tent, cabin or detached automobile, trailer or truck used as a temporary abode for the purpose of hunting or trapping, or the dwelling house or outbuildings of a caretaker or a camp or boardinghouse used for the purpose of hunting or trapping, or harboring hunters or trappers;

(7) secure and execute search warrants, and, in pursuance thereof, enter any building, dwellinghouse, tavern, hotel, boardinghouse, enclosure or car, and break open any apartment, chest, locker, box, trunk, crate, basket, bag, package, or container, and examine the contents thereof;

(8) seize and take possession of all birds or animals which may have been caught, taken or killed;

(9) seize all guns, shooting or hunting paraphernalia, traps, dogs, boats, decoys, automotive equipment, or any unlawful device, implement or other appliance used in violation of The Game Law; and

(10) administer any oath relative to any violation of any law relating to game or other wild birds or wild animals, and where game is found in a camp or in possession or control of any individual or hunting party, to question such person or persons, under oath, relative to the taking, ownership or possession of such game. 34 P.S. § 1311.214.

**4.** Appellants were confronted with the following penalties under Article VII of The Game Law: (1) fines and costs of prosecution in excess

be a lot better if [they] owned up to it." All of these circumstances lead us to conclude that the questioning by the protectors was custodial interrogation and that the statements of appellants must be suppressed.

■ We hold that a game protector may upon reasonable suspicion stop a vehicle and may upon probable cause search a vehicle but that the game protector must apprise an individual so halted of the rights which *Miranda* safeguards prior to turning the inquiry from questions of an investigative nature to interrogation that is accusatory. *Commonwealth v. Meyer,* 488 Pa. 297, 412 A.2d 517 (1980); *Commonwealth v. Anderson, supra; Commonwealth v. Bonser,* 215 Pa.Super. 452, 258 A.2d 675 (1969). *See also* Annot., 31 A.L.R.3d 565.

We are of a mind that such a holding is required by the pronouncement of the United States Supreme Court in *Estelle v. Smith,* 451 U.S. 454, 466–67, 101 S.Ct. 1866, 1875, 68 L.Ed.2d 359, 371 (1981), that:

> In *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966), the Court acknowledged that 'the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons *in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.*' *Miranda* held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' *Id.,* at 444, 86 S.Ct., 25 1612. Thus, absent other fully effective procedures, a person in custody must receive certain warnings before any official interrogation, including that he has a 'right to remain silent' and that 'anything said can and will be used

of two hundred dollars ($200.00) each; (2) loss of hunting license for three years; (3) forfeiture of (i) a vehicle, (ii) firearms and (iii) spotlights; and (4) a term of imprisonment in excess of two hundred days each if the fines and costs of prosecution were not paid. 34 P.S. § 1311.731.

against the individual in court.' *Id.*, at 467–469, 86 S.Ct., at 1624–1625. The purpose of these admonitions is to combat what the Court saw as 'inherently compelling pressures' at work on the person and to provide him with an awareness of the Fifth Amendment privilege and the consequences of foregoing it, which is the prerequisite for 'an intelligent decision as to its exercise.' (emphasis added).

The order of the Common Pleas Court reimposing sentence is vacated and appellants are granted a new trial. Jurisdiction is relinquished.