180 Cal.App.4th 1178 (2010)
THE PEOPLE, Plaintiff and Appellant,
v.
BOUHN MAIKHIO, Defendant and Respondent.
No. D055068.
Court of Appeals of California, Fourth District, Division One.
January 5, 2010.
*1182 Jan I. Goldsmith, City Attorney, David P. Greenberg, Assistant City Attorney, and Monica A. Tiana, Deputy City Attorney, for Plaintiff and Appellant.
Edmund G. Brown, Jr., Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Carol A. Squire and Deborah Fletcher, Deputy Attorneys General, for California Department of Fish and Game as Amicus Curiae on behalf of Plaintiff and Appellant.
Steven J. Carroll, Public Defender, Randy Mize, Chief Deputy Public Defender, Gary R. Nichols and Matthew Braner, Deputy Public Defenders, for Defendant and Respondent.

OPINION
McDONALD, J.
On transfer to this court from the Appellate Division of the San Diego County Superior Court, the People of the State of California *1183 appeal an order of the trial court granting defendant Bouhn Maikhio's Penal Code section 1538.5 motion to suppress evidence in its case against him for two misdemeanor fishing offenses. On appeal, the People contend the trial court erred by granting the motion to suppress because (1) Fish and Game Code[1] sections 1006 and 2012 authorized the Department of Fish and Game (DFG) warden to stop Maikhio's vehicle to conduct an inspection and that stop was reasonable under the Fourth Amendment to the United States Constitution even if he had no reasonable suspicion Maikhio was involved in criminal activity; and, alternatively, (2) the warden had reasonable suspicion under the Fourth Amendment that Maikhio was involved in criminal activity and therefore could lawfully stop Maikhio's vehicle. We conclude the DFG warden did not have either the statutory or constitutional authority to stop Maikhio's vehicle in the circumstances of this case.

FACTUAL AND PROCEDURAL BACKGROUND
About 11:10 p.m. on August 19, 2007, DFG Warden Erik Fleet issued a citation to Maikhio for possession of a California spiny lobster during closed season in violation of California Code of Regulations, title 14, section 29.90, subdivision (a), and for failure to exhibit his catch on demand in violation of section 2012. After the People filed a misdemeanor complaint (case No. M031897) against Maikhio, he was arraigned and pleaded not guilty. Maikhio subsequently moved to suppress evidence pursuant to Penal Code section 1538.5.
On December 14, the trial court heard Maikhio's motion to suppress, together with motions to suppress made by two other defendants in similar cases.[2] At the hearing, Fleet testified that about 11:00 p.m. on August 19, 2007, he was on duty and observed activities on the Ocean Beach pier by using a spotting telescope mounted on his truck, which was parked on Narragansett Street. Fleet saw Maikhio fishing on the pier, using a method called hand-lining. Maikhio was accompanied by a woman and an infant. Fleet saw Maikhio catch something and place it in a black bag next to him. Fleet could not see what Maikhio had caught and placed in the bag. Fleet watched as Maikhio and the other two persons left the pier, entered the parking lot, and drove away from the parking lot in Maikhio's vehicle. Fleet then stopped Maikhio's vehicle because he "wanted to make sure . . . that he [Maikhio] was in compliance with the California fishing laws and regulations." Fleet testified that he did "[n]ot necessarily" suspect at the time of the stop that Maikhio had broken the law.
*1184 After stopping Maikhio's vehicle, Fleet, who was in uniform, approached Maikhio and introduced himself as a DFG warden. Fleet asked Maikhio if he had any fish or lobsters in his vehicle. Maikhio answered, "no." Fleet then searched the vehicle pursuant to section 1006 and found the black bag in the rear passenger area under the woman's feet. He looked inside the bag and found a California spiny lobster. Fleet placed Maikhio in handcuffs for his (Fleet's) safety, sat Maikhio on the curb, and continued his search of the vehicle (which revealed nothing more). Maikhio eventually admitted the lobster was his.
Fleet issued a citation to Maikhio for possessing a lobster during closed season (Cal. Code Regs., tit. 14, § 29.90, subd. (a)) and for failing to exhibit his catch on demand (§ 2012). Fleet testified that, pursuant to his training as a DFG warden, he waited to stop Maikhio's vehicle until after Maikhio left the pier and parking lot so that Fleet would not "blow [his] cover" at the pier and therefore could continue to effectively "work" the pier and catch other possible law violators that night. On direct examination by the prosecutor, Fleet described the method of "hand-line" fishing: "They were fishing on the pier in a method we call hand lining, which is commonly used to catch lobsters. It's an illegal method of catching lobsters, but it's very productive and it's basically a person holds a fishing line in their hand, either the fishing line goes back to their fishing rod and reel or they hold it in their hand and they jerk the fishing line which generally has a treble hook on the bottom of it with the weight on it and squid is usually used for bait. And it gives them a better feel of the bottom because a lobster doesn't strike the bait, it will actually climb onto the bait and they lift the line up when they feel weight on it, they jerk it which causes the hook to penetrate the lobster and they bring it up. It's very common and that's what drew my attention to [Maikhio]." However, on cross-examination, Fleet admitted that hand-lining can also be used for regular fishing. Following arguments of counsel, the trial court granted Maikhio's motion to suppress evidence.
On appeal, the Appellate Division of the San Diego County Superior Court initially reversed the trial court's order granting Maikhio's motion to suppress and, after a rehearing, again reversed the trial court's order. The appellate division concluded Fleet lawfully stopped Maikhio under sections 1006 and 2012 to conduct a compliance inspection. In addition, it concluded Fleet had reasonable suspicion to believe Maikhio was in possession of an illegally caught lobster, based on his observation of Maikhio using the hand-lining method to catch something, because that method of fishing is commonly used to catch lobsters.
Maikhio filed an application for certification for transfer of the case to this court pursuant to California Rules of Court, rule 8.1005. On May 5, 2009, the *1185 appellate division issued an order granting Maikhio's application for certification for transfer, stating "[t]ransfer is necessary to settle the following important question of law: Whether Fish and Game Code sections 1006 and 2012 authorize vehicle stops without reasonable suspicion of criminal conduct."
On May 20, 2009, we issued an order transferring the case to this court for hearing and decision. We requested briefing by the parties on the following issues: "(1) whether Fish and Game Code sections 1006 and 2012 authorize vehicle stops without reasonable suspicion of criminal conduct; and (2) whether the warden in this case had reasonable suspicion to believe Maikhio was engaged in illegal lobster fishing." The parties have submitted, and we have considered, briefs on those issues.

DISCUSSION

I

Vehicle Stops Pursuant to Sections 1006 and 2012 Without Reasonable Suspicion of Criminal Activity
The People contend Fleet lawfully stopped Maikhio's vehicle pursuant to sections 1006 and 2012 without reasonable suspicion that he committed any crime. They argue Fleet's authority to stop Maikhio's vehicle must be implied as necessary to carry out express powers granted to the DFG by sections 1006 and 2012, and the stop was reasonable under the Fourth Amendment. The parties do not cite, and we are unaware of, any case addressing this question, which we believe is one of first impression.

A
(1) In interpreting a statute, we first examine the actual language of the statute and give the statute's words their ordinary, everyday meaning unless the statute gives them a special meaning. (Halbert's Lumber, Inc. v. Lucky Stores, Inc. (1992) 6 Cal.App.4th 1233, 1238-1239 [8 Cal.Rptr.2d 298].) If the meaning of a statute's language is certain and unambiguous, then its language controls. (Id. at p. 1239.) However, if the meaning of a statute's words is not clear, we review the statute's legislative history. (Ibid.) In the event a statute's language and legislative history do not reveal a clear meaning, we then apply reason, practicality, and common sense to its language to, if possible, interpret the statute's words to make them workable and reasonable. (Id. at pp. 1239-1240.) Finally, "[i]f a statute is susceptible of two constructions, one of which will render it constitutional and the other *1186 unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. [Citations.] The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers." (Miller v. Municipal Court (1943) 22 Cal.2d 818, 828 [142 P.2d 297].)
Section 1006 provides:
"The department [the DFG] may inspect the following:
(2) "(a) All boats, markets, stores and other buildings, except dwellings, and all receptacles, except the clothing actually worn by a person at the time of inspection, where birds, mammals, fish, reptiles, or amphibia may be stored, placed, or held for sale or storage . . . ." Section 2012 provides: "All licenses, tags, and the birds, mammals, fish, reptiles, or amphibians taken or otherwise dealt with under this code, and any device or apparatus designed to be, and capable of being, used to take birds, mammals, fish, reptiles, or amphibians shall be exhibited upon demand to any person authorized by the department to enforce this code or any law relating to the protection and conservation of birds, mammals, fish, reptiles, or amphibians." We conclude, as Maikhio asserts and the People apparently concede, the language of section 1006 does not provide for the inspection of vehicles by the DFG. The words used in section 1006 do not include the word "vehicle," and its other words cannot be reasonably construed to include inspection of vehicles. We conclude the ordinary, everyday meaning of the word "receptacles" does not include vehicles. In interpreting virtually identical language contained in section 1006's predecessor (i.e., former § 23),[3] the California Attorney General in 1944 addressed this precise question and concluded: "[T]here is nothing in [former] [s]ection 23 which commands the search or inspection of automobiles. As used in that section the word `receptacles' cannot be extended to connote motor vehicles. The sentence in which the word is contained was added to Section 642 of the Political Code by Stats. 1915, page 727, and a reading of the whole indicates that the legislature did not intend to include automobiles by implication in the enumeration of places and things that shall be inspected. Moreover, it must be borne in mind that in 1915 automobiles were not as extensively used as they are *1187 today and the probability of transporting contraband game in cars was not as likely then as it is now. [Former] [s]ection 23, therefore, confers no authority on the Commission or its officers to inspect or search automobiles." (4 Ops.Cal.Atty.Gen., supra, at p. 407, italics added.) In 1957, the Legislature repealed former section 23 and reenacted it as section 1006 without substantial modification to the DFG's inspection authority. (Stats. 1957, ch. 456, pp. 1308, 1330.) In 1972, the Legislature amended section 1006, but only added reptiles to the list of animals. (Stats. 1972, ch. 974, § 4, p. 1766.) Because we presume the Legislature was aware of the Attorney General's 1944 opinion when it enacted and subsequently amended section 1006, we presume the Legislature approved of the Attorney General's construction of section 1006 as not including vehicles within the DFG's inspection authority. (Orange County Employees Assn., Inc. v. County of Orange (1993) 14 Cal.App.4th 575, 582-583 [17 Cal.Rptr.2d 695]; Henderson v. Board of Education (1978) 78 Cal.App.3d 875, 883 [144 Cal.Rptr. 568].) Had the Legislature disagreed with the Attorney General's 1944 interpretation of former section 23, it presumably would have expressly included the word "vehicles" on enacting or subsequently amending section 1006. Had the Legislature intended to authorize the DFG and its wardens to inspect vehicles, it could have expressly so provided by simply adding the word "vehicles" to section 1006's list of items that may be inspected. We therefore conclude the Legislature intended the DFG's section 1006 inspection authority to not extend or apply to vehicles. Because the plain meaning of the words of section 1006 and its legislative history show section 1006's inspection authority does not include inspection of vehicles, we need not address the remaining rules of statutory construction. In any event, we conclude reason, practicality, and common sense support our interpretation of section 1006. Our interpretation also avoids any potential constitutionality issues were section 1006 interpreted as granting the DFG and its wardens broad authority to inspect vehicles. (Miller v. Municipal Court, supra, 22 Cal.2d at p. 828.)
(3) Apparently conceding section 1006 does not expressly authorize the DFG or its wardens to inspect vehicles, the People assert the DFG's authority to stop and inspect vehicles must be implied as necessary to carry out express powers granted it under sections 1006 and 2012. In People v. Perez (1996) 51 Cal.App.4th 1168 [59 Cal.Rptr.2d 596], the court noted the general rule that "[g]overnment officials may exercise such powers as are necessary to carry out the powers granted by statute or that may be fairly implied from the statute. [Citation.]" (Id. at p. 1178; see also Dickey v. Raisin Proration Zone No. 1 (1944) 24 Cal.2d 796, 810 [151 P.2d 505]; Betchart v. Department of Fish & Game (1984) 158 Cal.App.3d 1104, 1109 [205 Cal.Rptr. 135].) Pursuant to the powers expressly granted to the DFG by section 1006 to *1188 inspect boats and receptacles in which fish may be stored and by section 2012 to demand that a person exhibit his or her catch, we agree with the People's assertion that there are certain additional powers that may be fairly implied as necessary to carry out those express powers. For example, it may be fairly implied from sections 1006 and 2012 that a DFG warden generally has the implied power to stop people who are fishing on a pier to demand they exhibit their catch and to inspect their receptacles (e.g., tackle boxes, pails, etc.) in which fish may be stored. However, contrary to the People's conclusory assertion, it cannot be fairly implied from the DFG's express statutory powers that its wardens have the power to stop a specific vehicle on a public street and detain its occupants to make a section 2012 demand and conduct a section 1006 inspection. Unlike the DFG hunting checkpoint held constitutionally reasonable in Perez, the circumstances in this case involve a traffic stop of a specific vehicle (i.e., Maikhio's vehicle) by a DFG warden. (Cf. People v. Perez, supra, 51 Cal.App.4th at pp. 1171-1173, 1179.) Neither Perez nor any of the other cases cited by the People persuade us that it may be fairly implied from sections 1006 and 2012 that it is necessary for the DFG to conduct traffic stops and inspections of specific vehicles on public streets to accomplish the express powers granted to it by those statutes.

B
(4) We further conclude, contrary to the People's assertion, that Fleet's stop of Maikhio's vehicle was not a reasonable regulatory or other seizure under the Fourth Amendment and therefore required reasonable suspicion Maikhio was involved in criminal activity. The Fourth Amendment prohibits "unreasonable searches and seizures." Maikhio's vehicle was subjected to a "seizure" within the meaning of the Fourth Amendment when Fleet stopped it on a public street and detained its occupants. (Delaware v. Prouse (1979) 440 U.S. 648, 653 [59 L.Ed.2d 660, 99 S.Ct. 1391].) "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. [Citation.]" (Indianapolis v. Edmond (2000) 531 U.S. 32, 37 [148 L.Ed.2d 333, 121 S.Ct. 447] (Edmond).) However, in certain limited or exceptional circumstances, reasonable suspicion of criminal activity is not required for a seizure to be reasonable under the Fourth Amendment. (Edmond, at p. 37.) Edmond stated: "[W]e have upheld certain regimes of suspicionless searches [or seizures] where the program was designed to serve `special needs, beyond the normal need for law enforcement.' [Citations.] We have also allowed searches for certain administrative purposes without particularized suspicion of misconduct, provided that those searches are appropriately limited. [Citations.]" (Ibid.) The United States Supreme Court has "also upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens [citation] and at a sobriety checkpoint aimed at removing drunk drivers from the road [citation]." (Ibid., *1189 citing United States v. Martinez-Fuerte (1976) 428 U.S. 543 [49 L.Ed.2d 1116, 96 S.Ct. 3074]; Michigan Dept. of State Police v. Sitz (1990) 496 U.S. 444 [110 L.Ed.2d 412, 110 S.Ct. 2481].) "In none of these cases, however, did [the United States Supreme Court] indicate approval of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." (Edmond, at p. 38.) In the circumstances of Edmond, the court held: "Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment." (Id. at pp. 41-42.) Edmond stated: "When law enforcement authorities pursue primarily general crime control purposes at checkpoints such as here, . . . stops can only be justified by some quantum of individualized suspicion." (Id. at p. 47.)
However, if the primary purpose of a stop or seizure is to promote a "special need" of government beyond the normal need for law enforcement and is not to uncover evidence of ordinary criminal wrongdoing, the "special needs" exception to the usual requirement for individualized, reasonable suspicion for a stop or seizure may apply if, on balancing the government's "special need" against its intrusion on the individual's Fourth Amendment privacy right, a court determines the stop or seizure was reasonable under the Fourth Amendment.[4] (Treasury Employees v. Von Raab (1989) 489 U.S. 656, 665-666 [103 L.Ed.2d 685, 109 S.Ct. 1384]; Skinner v. Railway Labor Executives' Assn. (1989) 489 U.S. 602, 619 [103 L.Ed.2d, 109 S.Ct. 1402]; Vernonia School Dist. 47J v. Acton (1995) 515 U.S. 646, 652-653 [132 L.Ed.2d 564, 115 S.Ct. 2386]; Delaware v. Prouse, supra, 440 U.S. at pp. 654, 657-661; Edmond, supra, 531 U.S. at p. 37; U.S. v. Munoz (9th Cir. 1983) 701 F.2d 1293, 1297.) One court has also stated: "In assessing the strength of the government's interests, courts must ascertain whether the government could employ less intrusive alternatives. [Citations.]"[5] (U.S. v. Munoz, supra, 701 F.2d at p. 1300.)
(5) Accordingly, "[t]here is a two-step analysis applicable to Fourth Amendment checkpoint cases. First, the court must `determine whether the primary purpose of the [checkpoint] was to advance "the general interest in crime control.'" [Citation.] `If so, then the stop . . . is per se invalid under *1190 the Fourth Amendment.' [Citations.] [¶] If the checkpoint is not per se invalid as a crime control device, then the court must `judge [the checkpoint's] reasonableness, hence, its constitutionality, on the basis of the individual circumstances.' [Citation.] This requires consideration of `the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.' [Citations.]" (U.S. v. Fraire (9th Cir. 2009) 575 F.3d 929, 932.) Although Fraire's two-step analysis specifically addressed vehicle checkpoints, there is no reason why the same analysis should not apply to other traffic stops of vehicles, including the stop of Maikhio's vehicle in this case.
(6) In the circumstances of this case, we conclude Fleet's stop of Maikhio's vehicle was indisputably made for normal law enforcement needs and to uncover evidence of ordinary criminal wrongdoing (i.e., a misdemeanor fishing offense) by a specific individual (i.e., Maikhio). As described in the factual and procedural part above, Fleet saw Maikhio hand-line fishing. He saw Maikhio catch something and place it in a black bag, but he could not see what Maikhio had caught. Fleet watched as Maikhio left the pier and drove away from the parking lot in his vehicle. Fleet then conducted a traffic stop of Maikhio's vehicle on a public street because he "wanted to make sure . . . that [Maikhio] was in compliance with the California fishing laws and regulations." Accordingly, the primary, if not sole, purpose of Fleet's stop of Maikhio's vehicle was to determine whether Maikhio had violated a fishing law (i.e., committed a misdemeanor fishing offense) and presumably to cite Maikhio if Fleet determined he had done so. That purpose was clearly to detect or uncover evidence of ordinary criminal wrongdoing and therefore promote the general purpose of crime control. Because Fleet's stop of Maikhio's vehicle did not serve a "special need" of government, it was per se unreasonable under the Fourth Amendment (absent the existence of reasonable suspicion that Maikhio was involved in criminal activity).[6] (Edmond, supra, 531 U.S. at pp. 37-38, 41-42, 47; U.S. v. Fraire, supra, 575 F.3d at pp. 931-932.) "Because the primary purpose of [Fleet's stop of Maikhio's vehicle was] to uncover evidence of ordinary criminal wrongdoing, the [stop] contravene[d] the Fourth Amendment [if Fleet had no reasonable suspicion that Maikhio was involved in criminal activity]." (Edmond, at pp. 41-42.) *1191 Like the court in Edmond, "[w]e decline to suspend the usual requirement of individualized suspicion where [a DFG warden] seek[s] to employ a [traffic stop of a specific vehicle] primarily for the ordinary enterprise of investigating crimes." (Id. at p. 44.)
Contrary to the People's assertion, the stop of Maikhio's vehicle was not done primarily for the "special need" purpose of educating Maikhio or another purpose beyond the normal need for law enforcement. Although we agree the DFG and its wardens have a governmental interest in protecting California's fish and wildlife, we disagree with the People's assertion that the DFG's enforcement of fish and wildlife laws and regulations (e.g., stopping of vehicles to cite criminal offenders) serves a "special need" beyond the normal need for law enforcement. The People's suggestion that Fleet was only promoting "compliance" with, and not "enforcing," California's fishing laws and regulations is disingenuous and a distinction without a difference in the circumstances of this case. Likewise, the primary purpose of Fleet's stop of Maikhio's vehicle was not to protect fish and wildlife. Although criminal citations may have the effect of deterring and educating violators of California's fishing laws and regulations, that effect does not make the primary purpose of Fleet's stop of Maikhio's vehicle the protection of fish and/or educational, rather than criminal enforcement of those laws and regulations. People v. Perez, supra, 51 Cal.App.4th 1168, cited by the People, is factually inapposite and does not persuade us to conclude otherwise. That case involved a vehicle checkpoint primarily regulatory in purpose. (Id. at p. 1175.)
(7) Even were we to conclude the primary purpose of Fleet's stop of Maikhio's vehicle was not for normal law enforcement needs or to uncover evidence of ordinary criminal wrongdoing, it is likely that on applying the "special needs" balancing test we would conclude the suspicionless stop was unreasonable under the Fourth Amendment. We note that Maikhio had a substantial privacy interest in driving his vehicle on a public street at night. In Prouse, the United States Supreme Court stated: "We cannot agree that stopping or detaining a vehicle on an ordinary city street is less intrusive than a roving-patrol stop on a major highway [as held unconstitutional in United States v. Brignoni-Ponce (1975) 422 U.S. 873 [45 L.E.2d 607, 95 S.Ct. 2574]] . . . . We cannot assume that the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check documents is of any less moment than that occasioned by a stop by border agents on roving patrol. Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety. For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles *1192 making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community." (Delaware v. Prouse, supra, 440 U.S. at p. 657.)
(8) Traffic stops of vehicles also may have no preventive purpose or effect. "Because a motorist could not actively [violate fishing laws and regulations] while driving lawfully on [public] roads, vehicle stops can have no preventive purpose, other than a possible deterrent effect." (U.S. v. Munoz, supra, 701 F.2d at p. 1301.) Furthermore, although we assume the DFG has a significant interest in the protection of fish and other wildlife, that purported "special need" could be promoted through less intrusive means. "In assessing the strength of the government's interests, courts must ascertain whether the government could employ less intrusive alternatives. [Citations.]" (Id. at p. 1300.) In the circumstances in this case, Fleet could have stopped Maikhio and inquired about his catch while Maikhio was on the pier or as he was walking to his car in the parking lot. That less intrusive means of protecting fish and wildlife presumably would have been reasonable under the Fourth Amendment. Likewise, a DFG checkpoint could have been established at the end of the pier or in the parking lot to educate the public regarding fish and wildlife laws and regulations. (Cf. People v. Perez, supra, 51 Cal.App.4th at pp. 1175-1179.)
(9) Although the People argue Fleet's method of using a spotting scope to observe fishing activity and then stop vehicles on public streets to check compliance with fishing laws and regulations is the most effective means of promoting the government's interest in protecting fish, the fact that a certain method of promoting a government interest is the most effective does not necessarily make it reasonable under the Fourth Amendment, particularly if a less intrusive method exists. Were we to balance Maikhio's privacy interest as an occupant of a vehicle traveling on a public street against the DFG's interest in educating the public and protecting fish, it is very likely we would conclude Fleet's presumed suspicionless traffic stop of Maikhio's vehicle was unreasonable under the Fourth Amendment. (Cf. People v. Levens (1999) 306 Ill.App.3d 230 [239 Ill.Dec. 425, 713 N.E.2d 1275, 1277] ["[A] conservation officer may not stop a motorist if the officer merely believes that the motorist is currently or was very recently engaged in lawful hunting. Because a traffic stop is a greater intrusion than a brief detention in the field, we require that an officer must reasonably believe that a motorist's hunting is illegal before the officer may make a valid stop."]; State v. Larsen (Minn. 2002) 650 N.W.2d 144, 153-154 ["While the state clearly has a strong interest in regulating and protecting its wildlife, . . . the warrantless search of a fish house by a conservation officer is per se unreasonable in the absence of express consent or other circumstance justifying entry and therefore is unconstitutional under the Fourth Amendment . . . ."].)

*1193 II

Reasonable Suspicion Under the Fourth Amendment
The People alternatively contend the trial court erred by granting Maikhio's motion to suppress evidence because Fleet had reasonable suspicion under the Fourth Amendment that Maikhio was involved in criminal activity and therefore could lawfully stop Maikhio's vehicle.

A
(10) In certain circumstances, a police officer may stop and briefly detain a person for questioning or other limited investigation. (In re Tony C. (1978) 21 Cal.3d 888, 892 [148 Cal.Rptr. 366].) "[T]o justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question. The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]" (Id. at p. 893, fn. omitted.)
In determining the reasonableness of a stop or detention, we must consider the totality of the circumstances.[7] (People v. Loewen (1983) 35 Cal.3d 117, 128-129 [196 Cal.Rptr. 846, 672 P.2d 436].) "[A]n assessment of the whole picture must yield a particularized suspicion . . . that the particular individual being stopped is engaged in wrongdoing." (United States v. Cortez (1981) 449 U.S. 411, 418.) "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct." (In re Tony C., supra, 21 Cal.3d at p. 894.) However, "no stop or detention is permissible when the circumstances are not reasonably `consistent with criminal activity' and the investigation is therefore based on mere curiosity, rumor, or hunch." (Ibid.) "The process [of determining the existence of reasonable suspicion] does not deal with hard certainties, but with probabilities." (Cortez, at p. 418.)
"On review of a motion to suppress, we defer to the trial court's factual findings, where supported by substantial evidence, but must independently *1194 assess, as a question of law, whether under the facts as found the challenged search and seizure conforms to the constitutional standards of reasonableness." (People v. Franklin (1987) 192 Cal.App.3d 935, 939 [237 Cal.Rptr. 840].) In opposing a Penal Code section 1538.5 motion to suppress, the prosecution has the burden to prove "that the warrantless search or seizure was reasonable under the circumstances. [Citations.]" (People v. Williams (1999) 20 Cal.4th 119, 130 [83 Cal.Rptr.2d 275, 973 P.2d 52].)

B
Based on our review of the totality of the circumstances in this case, we conclude Fleet did not have, at the time of the traffic stop, specific and articulable facts causing him (or a reasonable DFG warden) to suspect some activity relating to crime had taken place and Maikhio was involved in that activity. (In re Tony C., supra, 21 Cal.3d at p. 893.) At the hearing on Maikhio's motion to suppress evidence, Fleet testified that, using a spotting scope, he saw Maikhio fishing by using the hand-lining method. He saw Maikhio catch something, but could not see what he caught and placed in the black bag. Fleet testified the hand-lining method can be used to catch fish, but also is commonly used to catch lobsters. While catching fish with that method is lawful, catching lobsters out of season with that method is not. After Maikhio left the pier and drove his vehicle out of the parking lot and onto public streets, Fleet stopped Maikhio's vehicle. Fleet testified that although he did "[n]ot necessarily" suspect at the time of the stop that Maikhio had broken the law, he stopped Maikhio's vehicle because he "wanted to make sure . . . that he [Maikhio] was in compliance with the California fishing laws and regulations."
The People argue specific and articulable facts existed for Fleet's stop of Maikhio's vehicle. They rely on the fact that Fleet saw Maikhio catch something using the hand-lining method of fishing. However, based on the record in this case, we conclude the People did not carry their burden to prove Fleet had a reasonable suspicion Maikhio was involved in criminal activity based on his use of the hand-lining method of fishing. That method could lawfully be used to catch fish. Although that method could also be used to catch lobsters, neither Fleet nor any other prosecution witness testified at the hearing that the hand-lining method of fishing was, in his experience and/or training, generally used more often to illegally catch lobsters than to lawfully catch fish. Absent any testimony or other evidence showing there was a substantial possibility, much less a likelihood, that an angler (e.g., Maikhio) would use the hand-lining method to illegally catch lobsters, Fleet lacked a reasonable suspicion that Maikhio was involved in criminal activity (i.e., had illegally caught a lobster out of season). Although it is true, as the People assert, reasonable suspicion may exist even if a suspect's activity is *1195 consistent with innocent or lawful activity, Maikhio's hand-lining method of fishing, based on the record in this case, does not support a conclusion that Fleet had reasonable suspicion Maikhio illegally caught a lobster out of season using that method.
(11) In circumstances involving ambiguous conduct that could be either legal or illegal activity, an officer may not make an investigative stop or detention unless that conduct, in the context of the totality of the circumstances, gives rise to reasonable suspicion that the suspect is involved in criminal activity. Although, based on the totality of the circumstances at the time of the stop, it was possible Maikhio had used the hand-lining method to illegally catch a lobster, the record was devoid of any evidence showing there was a substantial possibility he had done so. Absent that substantial possibility, Fleet in effect acted on a mere hunch or speculation that Maikhio had illegally caught a lobster out of season.
An investigative stop or detention based on a mere hunch of criminal activity is unreasonable under the Fourth Amendment. (In re Tony C., supra, 21 Cal.3d at p. 894; People v. Loewen, supra, 35 Cal.3d at p. 123; People v. Hernandez (2008) 45 Cal.4th 295, 299 [86 Cal.Rptr.3d 105, 196 P.3d 806].) In Hernandez, the California Supreme Court recently concluded that although "some people driving with a [displayed] temporary [vehicle] permit may be violating the law [e.g., that permit may be forged or issued for a different vehicle], [the officer] could point to no articulable facts supporting a reasonable suspicion that [the defendant], in particular, may have been acting illegally." (Hernandez, at p. 299.) Likewise, although in this case some people fishing with the hand-lining method may be violating the law [e.g., by catching an out-of-season lobster], Fleet "could point to no articulable facts supporting a reasonable suspicion that [Maikhio], in particular, may have been acting illegally." (Ibid.; see also People v. Perrusquia (2007) 150 Cal.App.4th 228, 233-234 [58 Cal.Rptr.3d 485] [no reasonable suspicion where officer saw defendant park his idling car in a convenience store's parking lot near a street exit, heard something thud on car's floorboard, and observed defendant attempt to avoid contact with officers]; People v. Krohn (2007) 149 Cal.App.4th 1294, 1299 [58 Cal.Rptr.3d 60]; People v. Jones (1991) 228 Cal.App.3d 519, 524 [279 Cal.Rptr. 56] [no reasonable suspicion where officer saw man receiving money from another in a high crime neighborhood]; People v. Roth (1990) 219 Cal.App.3d 211, 215 [268 Cal.Rptr. 66] [no reasonable suspicion where officer saw man walking in early morning hours in deserted parking lot of closed shopping center]; People v. Butler (1988) 202 Cal.App.3d 602, 606-607 [248 Cal.Rptr. 887] [no reasonable suspicion where officer saw car with tinted windows near a liquor store]; U.S. v. Kerr (9th Cir. 1987) 817 F.2d 1384, 1387 [no reasonable suspicion where officer saw man loading boxes into vehicle in residential area in *1196 midafternoon]; People v. Levens, supra, 713 N.E.2d at p. 1277 ["[A] conservation officer may not stop a motorist if the officer merely believes that the motorist is currently or was very recently engaged in lawful hunting. Because a traffic stop is a greater intrusion than a brief detention in the field, we require that an officer must reasonably believe that a motorist's hunting is illegal before the officer may make a valid stop."].) We conclude, based on the totality of the circumstances shown in the record, Fleet did not have reasonable suspicion to stop Maikhio's vehicle.[8] Therefore, the trial court correctly granted Maikhio's motion to suppress evidence.

DISPOSITION
The order is affirmed.
Huffman, J., concurred.
BENKE, Acting P.J., Dissenting.
With due respect I dissent.
There is no dispute in this record that on the evening of August 19, 2007, Department of Fish and Game Warden Erik Fleet saw defendant and appellant Bouhn Maikhio fishing off the Ocean Beach pier with a hand line. There is also no dispute that Fleet saw Maikhio pull something up on the line and put it in a black bag next to him. Finally, there is no dispute Fleet saw Maikhio leave the pier in his car with two companions and that very shortly thereafter, within the vicinity of the pier, Fleet stopped Maikhio's car.
On these facts there can be no serious question Fleet was entitled to stop Maikhio's car under the authority provided to him by Fish and Game Code[1] sections 1006 and 2012. It is true section 1006 does not permit game wardens to make random stops for the purpose of determining whether citizens have *1197 engaged in regulated hunting or fishing activity. (See 4 Ops.Cal.Atty.Gen. 405, 407-409 (1944).) However, in interpreting the predecessor to section 1006, the Attorney General was careful to distinguish the unfettered right to stop any vehicle, which the Attorney General rejected, from the situation which arises here, where a game warden has good reason to believe that the occupants of a vehicle have been recently engaged in regulated hunting or fishing. Under the Attorney General's interpretation of the statute, a warden's observation of a vehicle emerging from a duck club during the open season would give the warden the "right to stop the car and inquire if any game had been taken. If possession of game was denied, the warden would not have the right to search the car in the absence of probable cause for believing that such a denial was untrue. If possession was admitted, he would have the right to demand an exhibition of the game under Section 403 of the Fish and Game Code. A refusal to exhibit the game would give rise to probable cause for searching the car without a warrant [citation]." (4 Ops.Cal.Atty.Gen., supra, at p. 409.)
Contrary to the majority's conclusion, Fleet did precisely what the Attorney General's opinion expressly permitted and, by implication, what the Legislature intended to permit by later enactment of section 1006 without substantial change from its statutory predecessor. (See Orange County Employees Assn., Inc. v. County of Orange (1993) 14 Cal.App.4th 575, 582-583 [17 Cal.Rptr.2d 695].) Fleet not only observed Maikhio leaving a fishing area, he actually saw Maikhio engaged in the act of fishing. Under the Attorney General's opinion and the presumptive intent of the Legislature, that fact alone gave Fleet the authority to stop Maikhio's car and inquire about any fish Maikhio had taken. (See 4 Ops.Cal.Atty.Gen., supra, at p. 409.) Thus, having lawfully stopped Maikhio's car, Fleet was authorized by section 2012 to inquire of Maikhio whether he had any fish or lobsters in the car. (See 4 Ops.Cal.Atty.Gen., supra, at p. 409.) When Fleet received a negative response, which he had probable cause to believe was false, Fleet was then authorized to search the car. (See ibid.)
The Attorney General's conclusion is based on the broad authority game wardens have in regulating the capture of fish and game. Because of the highly regulated nature of hunting and fishing and the consequent diminished expectation of privacy of hunters and fishermen, there is no requirement in our statutes or under the Constitution that a game warden believe that any crimes have been committed or that any game regulations have been violated before exercising his or her powers of inspection. (See People v. Perez (1996) 51 Cal.App.4th 1168, 1177-1178 [59 Cal.Rptr.2d 596]; see also Elzey v. State (1999) 239 Ga.App. 47 [519 S.E.2d 751]; People v. Layton (1990) 196 Ill.App.3d 78 [142 Ill.Dec. 539, 552 N.E.2d 1280, 1286-1287].)
*1198 In finding that evidence of hunting alone, without any suggestion that any hunting regulations had been violated, was sufficient under the Constitution to support the detention of hunters, the court in People v. Perez stated: "In analyzing the reasonableness of the search (inspection) and seizure (detention) of hunters, the special nature of hunting is significant. Indeed, the issue of the constitutionality of warrantless inspections by game wardens was anticipated by Justice Blackmun in his concurring opinion in Delaware v. Prouse (1979) 440 U.S. 648 [59 L.Ed.2d 660, 99 S.Ct. 1391]. In Prouse, the court found roving patrols to check the licenses and registration of motorists were unconstitutional. Justice Blackmun stated: `I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties.' (Id. at p. 664 [59 L.Ed.2d at p. 674] (conc. opn. of Blackmun, J.).)
"As explained above, hunting is a highly regulated activity. `The wild game within a state belongs to the people in their collective, sovereign capacity; it is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for its protection or preservation, or the public good.' [Citation.] The high degree of regulation over the privilege of hunting, in turn, reduces a hunter's reasonable expectation of privacy. [Citation.]
"Under Fish and Game Code section 2006, officers have authority to check a hunter's rifles and shotguns to determine if they are loaded. [Citation.] Game wardens may inspect receptacles, except the hunter's clothing, where wildlife may be stored. (Fish & G. Code, § 1006.) Fish and Game Code section 2012 requires hunters to exhibit on demand licenses, tags, and the wildlife taken. Government officials may exercise such powers as are necessary to carry out the powers granted by statute or that may be fairly implied from the statute. [Citation.] To this end, wardens may, without a warrant, enter and patrol private open lands where hunting occurs to enforce fish and game laws [citation]; search a restaurant to inspect commercially caught fish [citation]; board a vessel to inspect the fishing haul [citation]; and inspect containers known to be used to hold game [citation].
"Given the highly regulated nature of hunting and the corresponding reduced expectation of privacy of hunters in their gear and their take from hunting, we find it is reasonable to detain hunters briefly, near hunting areas during hunting season, to inspect their licenses, tags, equipment, and any wildlife taken." (People v. Perez, supra, 51 Cal.App.4th at pp. 1177-1178.) One court has articulated this principle by stating that in light of the highly regulated nature of hunting, hunters are deemed to have consented to certain intrusions on their privacy. (People v. Layton, supra, 552 N.E.2d at p. 1287.)
*1199 Admittedly, in People v. Perez the defendant was stopped at a checkpoint, rather than, as here, as a result of a warden's roving patrol. However, that distinction was rejected by the courts in People v. Layton, supra, 552 N.E.2d at page 1286, and Elzey v. State, supra, 519 S.E.2d at pages 754-755, where hunters were stopped by wardens on roving patrols of hunting areas and their convictions for possession of drugs were upheld. In expressly rejecting the defendant's contention that hunters may properly be stopped and searched only at designated roadblocks, the court in People v. Layton stated: "The fact that such roadblock and checkpoint stops have been upheld cannot be equated to a rule that these are the only methods of enforcing game laws which do not violate the fourth amendment." (People v. Layton, supra, 552 N.E.2d at p. 1286.) Thus the court held: "It is elemental that wildlife licensing and regulatory provisions must be enforceable during the hunt and immediately following it. The roving conservation officer patrol stopping hunters encountered in the field, as here, does not violate the fourth amendment." (Id. at p. 1287.)
The court in Elzey v. State agreed with the reasoning of the courts in People v. Perez and People v. Layton: "We believe [People v. Layton and People v. Perez] correctly recognize that actions by wildlife law enforcement officers in questioning hunters and checking their licenses and identification may be reasonable, even though such actions might be unreasonable outside the hunting context. Clearly, a [Department of Natural Resources] officer may approach a hunter in a state-operated wildlife management area to determine whether the hunter has the necessary license and permits and to ask him questions about his hunt, regardless of whether the officer has reason to suspect that the hunter has broken any laws." (Elzey v. State, supra, 519 S.E.2d at p. 755, italics added.)
Plainly, where my colleagues have erred is in requiring that game wardens suspect a violation of law has occurred before they stop and question hunters and fishermen.[2] While in other nonregulatory contexts such a suspicion is needed before citizens may be stopped, by voluntarily engaging in highly regulated hunting and fishing activities, citizens such as Maikhio have implicitly agreed game wardens may stop them at or near the time and place of such activities and take reasonable steps to verify that the requirements of applicable hunting and fishing regulations have been met. By taking this regulatory power away from game wardens, the majority has seriously imperiled the state's vital interest in protecting fish and wildlife from depredation.
*1200 Here, under the authority provided by section 1006, Maikhio was detained immediately after and very near the area where Fleet had witnessed Maikhio fishing with a hand line. In detaining Maikhio under those circumstances, Fleet acted in conformance with sections 1006 and 2012 and the Constitution.
NOTES
[1] All further statutory references are to the Fish and Game Code unless otherwise specified.
[2] Those other cases were People v. Nguyen (case No. M031902) and People v. Herrera (case No. M031898).
[3] In 1944, former section 23 provided: "`The commission shall inspect regularly (1) all boats, markets, stores and other buildings, except dwellings, and all receptacles except the clothing actually worn by a person at the time of inspection, where birds, mammals, fish, mollusks, or crustaceans may be stored, placed or held for sale or storage . . . ." (4 Ops.Cal.Atty.Gen. 405, 406-407 (1944).)
[4] The "special needs" balancing test for Fourth Amendment reasonableness has been alternatively described as requiring the balancing of "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." (Brown v. Texas (1979) 443 U.S. 47, 51 [61 L.Ed.2d 357, 99 S.Ct. 2637].)
[5] This factor may, however, have little or no weight considering the United States Supreme Court's subsequent language in United States v. Sokolow (1989) 490 U.S. 1 [104 L.E.2d 1, 109 S.Ct. 1581], involving the related concept of reasonable suspicion: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques." (Id. at p. 11.)
[6] To the extent the 1944 opinion of the California Attorney General concluded a DFG warden may stop a vehicle to inquire if any game had been taken without any reasonable suspicion under the Fourth Amendment that the vehicle contained illegal game, we note it preceded the United States Supreme Court's decision in Terry v. Ohio (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868] and its progeny regarding investigatory stops and therefore does not reflect consideration of current Fourth Amendment principles. (4 Ops.Cal.Atty.Gen., supra, at pp. 407-410.) In any event, we are unpersuaded by the 1944 opinion's reasoning and instead decide this Fourth Amendment question of law based on our reasoning set forth in this opinion.
[7] "The concept of reasonable suspicion . . . is not `readily, or even usefully, reduced to a neat set of legal rules.' [Citation.]" (United States v. Sokolow, supra, 490 U.S. at p. 7.)
[8] We did not request, and the parties did not provide, briefing on the issue of whether, assuming Fleet had reasonable suspicion to stop Maikhio's vehicle, Fleet had probable cause to conduct a warrantless search of Maikhio's vehicle and the contents of the black bag in the vehicle. Although we need not decide that question considering our conclusion that Fleet lacked reasonable suspicion to stop Maikhio's vehicle, we nevertheless doubt Fleet had the requisite probable cause to search the vehicle and the black bag. (Cf. Commonwealth v. Palm (1983) 315 Pa.Super. 377 [462 A.2d 243, 247-248] ["While we conclude that the initial stop of the vehicle was valid, the game protectors did not have probable cause at that moment to search [the vehicle]. It is well settled that probable cause to justify a search without a warrant exists only where the facts and circumstances within the knowledge of the arresting or searching officer, or of which the officer had reasonable trustworthy information, are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed. [Citations.]"].) "[P]robable cause means `a fair probability that contraband or evidence of a crime will be found' [citation] . . . ." (United States v. Sokolow, supra, 490 U.S. at p. 7.)
[1] All further statutory references are to the Fish and Game Code.
[2] There is no dispute that the hand line method employed by Maikhio is commonly used to catch lobster and the lobster catch season was closed. However, I do not find this fact necessary to the implied consent doctrine I believe is applicable in this case.